A. C. HEROLD *et al. v.* T. C. TOWNSEND, *Tax Commissioner*

(No. 7546)

Submitted January 31, 1933.   Decided February 7, 1933.

*G. D. Herold* and *W. E. R. Byrne* and *George E. Price,* for relators.

*Howard B. Lee,* Attorney General and *T. C. Townsend,* Tax Commissioner, for respondent.

WOODS, JUDGE:

This proceeding involves the constitutionality of the "Tax Limitation Amendment" (House Joint Resolution No. 3, Adopted August 6, 1932, Chapter 9, Acts 1932, Extraordinary Session), which was submitted for ratification on Tuesday, November 8, 1932. The basis of the attack is that the proposed amendment was not "published at least three months before" the last general election "in some newspaper in every county in which a newspaper is printed," as provided in section 2, Article XIV of our Constitution.

The question is raised on the petition of A. C. Herold, and others, as citizens and tax-payers, in which they pray that a writ of mandamus issue against the state tax commissioner, requiring him, as such, to revoke instructions issued to the assessors of the state requiring them to list and classify real estate for purposes of taxation in conformity with said purported amendment, and to issue instructions requiring said assessors to proceed with said listing as provided by section 1, Article X, Constitution, and the laws enacted in pursuance thereof. The petition avers, in substance, that, in order to meet the requirements of Section 2, Article XIV, Constitution, the proposed amendment should have been published in some newspaper in each county in which a newspaper is printed on, or before, Monday, August 8, 1932; and that such publication was not effected in more than fifteen counties of the state.

The return of the tax commissioner avers that immediately upon the adoption of the resolution the Governor, in accordance with the enabling act (Chapter 10, Acts 1932, Extraordinary Session), proceeded, with all possible dispatch, to communicate with newspapers published in each and every county of the state, asking for rates at which they would publish the proposed amendment, and used every possible diligence to the end that such amendment might be published

in conformity to the literal requirements of Section 2, Article XIV, Constitution; that it was impossible to comply literally with the terms of the Constitution, relating to publication of amendments, between Saturday, August 6, 1932, the date the amendment was finally passed by the Legislature, and August 8, 1932, since in a majority of the counties no newspaper was published on August 6th, 7th or 8th; that the amendment was published in the counties of Brooke, Cabell, Hancock, Harrison, Kanawha, Marion, Marshall, Mercer, Mingo, McDowell, Ohio, Randolph, Summers, Taylor, and Tyler—a total of fifteen—on or before August 8, 1932, and in all other counties in the first issue of any paper printed therein after August 6, 1932; and that the proposed amendment was actually published in each and every county in West Virginia on or before August 13, 1932.

No issue of fact being raised by the pleadings, the question narrows down to one of construction. Was the amendment properly advertised? The relators contend that such regard must be had for the provision of publication as to make a strict and literal compliance therewith, while the respondents maintain that a substantial compliance therewith is sufficient. Both are in accord that under the great weight of authority of our state and nation, the provisions of the Constitutions are usually mandatory. *Capito* v. *Topping*, 65 W. Va. 587, 64 S. E. 845; *Simms* v. *Sawyers*, 85 W. Va. 245, 101 S. E. 467. In the last of the above cases the Court said: "The provisions of the constitution, the organic and fundamental law of the land, stand upon a higher plane than statutes, and they will, as a rule be held mandatory in prescribing the exact and exclusive methods of performing the acts permitted or required."

"Constitutions," says Judge Story, "are not designed for metaphysical or logical subtleties or niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understanding. The people make them, the people adopt them, the people must be supposed to read them with the help of common

sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.'' Story on the Constitution (5th Ed.), sec. 451. The foregoing language applies with equal force to amendments, and the fact that an amendment can be separated into two or more propositions concerning the value of which diversity of opinion may exist is not alone decisive.

The state constitution of Montana provides: ''The provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.'' But in the case of *State ex rel. Hay* v. *Alderson,* 49 Mont. 387, 414, 142 P. 210, where a question similar to the one here under consideration was raised, the court said: ''So long as human agencies are to be employed in carrying out the constitutional scheme of amendment, slight errors and defects in procedure are certain to occur, and to impose the rule of literal compliance would, for all practical purposes render the adoption of any amendment absolutely impossible and defeat one of the very purposes of the constitution itself. We ought not, by any strained construction, make the language of our constitution mean something altogether different from what the people had in contemplation in its adoption. No rule of construction should be invoked which will trammel the people in their efforts to exercise the right reserved to themselves to change their constitution by popular vote.''

Again, the adoption of the amendment to the state constitution of Kansas at the general election of 1880 prohibiting the manufacture and sale of intoxicating liquors, except for certain specified purposes, gave rise to several actions brought to test the validity of the amendment itself and its effect, if valid. Four of these cases were heard and considered together. *Constitutional Prohibitory Amendment,* 24 Kans. 700. The court there held, in substance that substantial compliance with the mandatory provisions of the constitution for its own amendment is sufficient in the absence of any intimation that injury—substantial or unsubstantial—resulted. And, in the course of the opinion, Brewer, J., who afterwards became a justice of the Supreme Court of the United States, said: ''The two important, vital elements in every constitutional amendment are the assent of two-thirds of the legislature and a

majority * * * vote. Beyond these, other provisions are mere machinery and forms. * * * Take a strong illustration: The constitution requires that the 'secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding,' etc. Suppose a unanimous vote of both houses of the legislature, and a unanimous vote of the people in favor of the constitutional amendment but that the secretary had omitted to publish in one county in which a newspaper was published, would it not be simply an insult to common sense to hold that thereby the will of the legislature and the people had been defeated? Is it within the power of the secretary, either through ignorance or design, to thwart the popular decision?''

One of the leading cases on the question is *State* v. *Winnett*, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. (N. S.) 149. In that state the constitution required a proposed constitutional amendment to be published once each week in at least one newspaper in each county of the state where a newspaper was published, for three months immediately preceding the election at which amendment was to be voted upon. The amendment there was voted upon at the election held on November 6, 1906, and the record showed that the amendment was published in at least one newspaper in each county prior to that date, but to have complied literally and strictly with the constitution such publication would have to have been commenced in each county of the state not later than August 6, 1906, while the facts were that in three counties such notice was published on the 9th and 10th of August, 1906, and in quite a few counties it was published every two weeks only. The Nebraska court held such publication to be a substantial compliance with the constitution, observing in its opinion that: ''If some accident beyond the control of the publisher should prevent the publication of the paper in which this notice should first have been published, or if some oversight, or some inducement offered to the publisher, had caused the notice to be omitted from that publication, the people of the whole state, although practically unanimous would be powerless to remedy the defect.'' The constitution of Georgia requires a proposed constitutional amendment to be published

in one or more newspapers in each congressional district for two months previous to the time of the next general election at which a proposed amendment shall be submitted to a vote of the people. In *Hammond* v. *Clark*, 136 Ga. 313, 71 S. E. 479, the court quoted with approval the whole of the quotation that we have given from the opinion in the *Kansas* case, and held the constitutional requirement as to pub'ication to be directory only. In *Manos* v. *State.* (Tex.) 263 S. W. 310, it is stated that the constitution of that state requires a proposed amendment to the constitution to be published once each week for four weeks commencing at least three months before the election, in each county in which a newspaper is published. One newspaper was published only three times in one county. and in four counties such publication was made within the three months' period next preceding the election. However, the court held that in the absence of any proof of fraud such publication was a substantial compliance with the constitution and the amendment was valid. In *Missouri* the constitution requires a proposed constitutional amendment to be published weekly in some newspaper, if such there be within each county of the state for four consecutive weeks preceding the next general election, then next ensuing, at which election the amendment should be voted upon. The Missouri court, in *Fahey* v. *Hackmann*, 237 S. W. 752, held that where a proposed amendment was published in one county in the state for only three weeks immediately prior to the election, such publication was a substantial compliance with the constitutional mandate. So, in Pennsylvania, in *Commonwealth* v. *Griest*, 196 Pa. St. 396, 46 A. 505, 50 L. R. A. 568, it appears that an amendment was submitted and ratified by the people, but the secretary failed to make the first publication in every county of the state as required by the constitution. The court said: ''So, we apprehend, in matters of legislation, where a performance of an authorized act has become impossible through no fault of the law, a later performance, if it satisfy the terms of the original duty, will be a sufficient compliance.''

The relators cite the case of *McCreary, Governor* v. *Spears*, 156 Ky. 783, 162 S. W. 99. There the constitution contained a statement similar to the one in our Constitution concerning the publication of notice to the people of a constitutional

amendment to be voted on. The court there held that a publication for sixty days was not a substantial compliance with the ninety-day requirement of the constitution. That proceeding was brought against the Governor before he had, by proclamation, declared the amendment to be a law; while in the instant case the Governor, on the 10th day of December, 1932, declared the amendment herein questioned to be a part of the State Constitution. It must be observed, however, that in the Kentucky case there was a very substantial deviation from the constitutional mandate as to publication.

It is one of the stipulations agreed upon that the ratification or rejection of the amendment here under consideration was a campaign issue in West Virginia in 1932; that both the Democratic and Republican parties indorsed the amendment; that it was discussed by campaign speakers in every section of every county, in every magisterial district, and every municipality of the state; that it was freely commented upon and discussed from time to time by daily and weekly newspapers published in every county of the state; that tracts, pamphlets, circulars, post cards and letters, relating to the amendment, were printed and distributed in large numbers in every voting precinct in West Virginia prior to the November election, 1932; that it was the subject of discussion in radio addresses; that every agency known to modern conditions for the dissemination of information was used to enlighten the electorate of the state of the content of the amendment; that no public question which has been before the people of the state was as thoroughly discussed and as thoroughly understood by the electorate as the amendment in question. This fact is emphasized by the vote of 335,482 for, to 43,931 against, the amendment.

Obviously the people of the state were not misled in any particular by the fact that the proposed amendment was not actually published at least three months before the election in some newspaper in every county in which a newspaper is printed. The publication was completed as expeditiously as was humanly possible, following the legislative action. Information was widespread in regard to the amendment. The publication, so far as actual notice to the electorate was concerned, was necessarily far superior to that which could have

been accorded an amendment submitted soon after the adoption of our Constitution in 1872. Today there is not a county in the state which does not receive copies of some daily published in the state on the date of its publication. How different in 1872! The cases from other courts, to which we have made reference, show a strikingly uniform holding against a literal construction of the time requirement relating to the publication of proposed amendments to state constitutions. While we consider the time requirement in our Constitution to be mandatory, we believe, under the circumstances of the instant case that it has been substantially complied with. As aptly expressed in the Nebraska case, "The self-imposed limitations on the power of the people to amend their fundamental law should not be so construed as to defeat the will of the people, plainly expressed, on account of a slight and unimportant failure to comply literally with such limitations, if the requirements are substantially observed."

The writ prayed for is accordingly denied.

*Writ denied.*

KENNA, JUDGE, took no part in the decision of this case because he sat as a member of the House of Delegates in the Regular 1931 and the Extraordinary 1932 Sessions when the Tax Amendment was under consideration, and because of the fact that legislative construction of the provision for amending the Constitution was advanced in argument.