STATE *ex rel.* C. R. MORGAN, *et al.*

*v.*

D. PITT O'BRIEN, *Secy. of State, of the State of West Virginia*

(No. 10110)

Submitted Oct. 26, 1948. Decided Oct. 27, 1948.

2

HAYMOND, KENNA, JUDGES, dissenting.

*Charles C. Wise* and *Ernest K. James,* for relators.

*Ira J. Partlow,* Attorney General, and *John C. Vance,* Assistant Attorney General, for respondent.

RILEY, PRESIDENT:

On October 21, 1948, at a regular term of this Court, the State of West Virginia *ex rel.* C. R. Morgan, George L. Coyle, George C. Schmidt and George W. Bright, citizens and taxpayers, filed their petition, seeking a writ of mandamus to command D. Pitt O'Brien, Secretary of State of the State of West Virginia, to revoke his certification for submission to the electorate of the State at the general election to be held on November 2, 1948, of a proposed amendment to the Constitution relating to a fifty million dollar bond issue for secondary road improvements. And, on October 27, 1948, this Court, after a hearing on the rule previously issued, entered an order denying the writ prayed for.

The relators' petition states, among other things, that the Legislature, on March 8, 1947, duly and regularly adopted Senate Joint Resolution No. 5 (Acts of the Legislature, 1947, p. 727), by a vote of two-thirds of all the members elected to each house, agreeing to the submission of the proposed amendment authorizing the issuance of State bonds not exceeding fifty million dollars for secondary road purposes; and on the last-mentioned date, duly and regularly passed an enabling act (Acts of the Legislature, 1947, Chapter 143), which was approved by the Governor, providing for the submission of the proposed amendment to the voters. The petition further alleges that Section 6 of the enabling act directs that the Governor shall cause the proposed amendment to be published in some newspaper in every county in the State, in which a newspaper is printed, at least three months before the election, at which the proposed amendment is to be voted on; that Section 2 of Article XIV of the Constitution of West Virginia requires that a proposed

amendment be published in some newspaper in every county in which a newspaper is printed, at least three months before such election; that notwithstanding the legislative directive and the constitutional requirement, the Governor did not cause the proposed amendment to be published in every county in which a newspaper is printed at least three months before the general election to be held on November 2, 1948, as he was required to do; and that, in fact, no publication of any kind was made until on or about August 30, 1948, about four weeks after the date on or before which the publication was required by law.

Respondent filed an answer admitting all the facts set forth in the petition, and setting forth what is purported to be a detailed statement of the actual facts concerning the proposed amendment and its publication, which answer denied the conclusion drawn from the facts as set forth in the petition to the effect that, because of the failure of the Governor to publish the proposed amendment to the Constitution, as required by Section 2, Article XIV of the Constitution, and the implementing statute (Chapter 143, Acts of the Legislature, 1947), the delayed publication will not avail for a valid submission of the proposed amendment to the vote of the electorate of the State of West Virginia.

The answer alleges that without any intent or design, but purely through inadvertence, the Governor failed to comply with the provisions in respect to the time of publication; that on August 27, 1948, the Governor caused to be forwarded by registered mail, return receipt requested, to one newspaper printed and published in each county of the State, his proclamation, incorporated in the answer, to the effect that the proposed amendment would be submitted to the voters of West Virginia, at the general election to be held on November 2, 1948, with the request that it be published. This proclamation sets forth that the question of the ratification or rejection of the amendment is proposed in accordance with the provisions of Section 2, Article XIV of the Constitution. The answer

further alleges that one newspaper publication was had in each of the following counties on the dates specified: in Kanawha and Marshall, on August 30, 1948; in Cabell, Marion, Mingo, McDowell, Tucker, and Wood, on August 31, 1948; in Fayette, Hampshire, Hardy, Mercer and Webster on September 1, 1948; in Barbour, Braxton, Brooke, Calhoun, Clay, Doddridge, Gilmer, Grant, Greenbrier, Hancock, Harrison, Jackson, Jefferson, Lincoln, Mason, Monongalia, Monroe, Nicholas, Ohio, Pendleton, Pleasants, Pocahontas, Preston, Raleigh, Roane, Tyler and Wetzel, on September 2, 1948; in Berkeley, Lewis, Logan, Morgan, Putnam, Randolph, Ritchie, Upshur, Wayne, Wirt and Wyoming, on September 3, 1948; in Taylor, on September 6, 1948; in Mineral, on September 7, 1948; in Boone, on September 16, 1948; and a second publication, in Lincoln, on September 9, 1948, constituting publication in fifty-four of the fifty-five counties of the State.

The answer further alleges that on August 27, 1948, the Governor forwarded by registered mail, return receipt requested, to the then editor of "The Leader", a newspaper published in Summers County, the proclamation, as in the cases of the other counties, and thereafter, to-wit, on August 28, 1948, received a return receipt postmarked at Hinton, the same being signed Henry E. Kinney, the then editor of the paper, by L. T. Anderson, designated as addressee's agent; that, so far as respondent is informed and believes, Anderson delivered the registered letter to Kinney on August 28, 1948, but shortly thereafter Kinney ceased to be the editor of the paper and left the State for the City of New York; and that publication of the proclamation thereafter failed to receive the attention of anyone connected with that newspaper and publication was not had at any time in Summers County.

The answer further alleges that there was a substantial compliance with the constitutional and statutory provisions relating to publication; and that the whole object, intent and purpose of the required publication is to give notice of the intent to submit a proposed amendment to the Constitution to the voters of the State so that they

may have time to consider the same and determine in their own minds whether they would adopt or reject the proposed amendment.

The answer further alleges that, in addition to the newspaper publicity given by the publication of the Governor's proclamation, the proposed bond issue, embraced in the amendment, received widespread publicity in the State from political and newspaper sources; that it was indorsed by both the Republican and Democratic parties at their respective state conventions held on August 14, 1948, the happenings of which conventions received wide newspaper publicity; that the Republican and Democratic candidates for governor and other political speakers discussed the proposed amendment from the political platform in every section of the State; that the proposed amendment has been freely commented upon and discussed from time to time by daily and weekly newspapers published in every county of the State; that circulars and letters relating thereto have been and are being published and delivered in every county and perhaps in every voting precinct; that it has been mentioned and discussed in radio addresses; and that, as a result of the failure of the Governor to cause the proposed amendment to be published at least three months prior to the general election held on November 2, 1948, state-wide publicity was given to the amendment because all of the newspapers published in the State carried stories of such failure, and many of the newspapers and political speakers in every section of the State have repeatedly made reference thereto; and, finally, the action of this Court on October 21, 1948, in granting the rule requiring this respondent to show cause in this proceeding received wide publicity, commencing in the afternoon of the same day by radio announcements and by afternoon newspapers published on that day.

It is alleged in the answer that respondent verily believes that the whole intent, purpose and object of the constitutional and statutory provisions, relating to the time and manner of publication, have been substantially

achieved, and that such constitutional and statutory re-
quirements have been substantially complied with.

The relators having demurred to the answer, the fac-
tual allegations of the latter must be taken as true. So the
newspaper publication requirement not having been lit-
erally complied with, we are presented with the questions
whether (1) A substantial compliance with the constitu-
tional and statutory provisions as to publication will suf-
fice; and (2) if so, does the answer set up such a sub-
stantial compliance as would justify the respondent in
certifying to each of the clerks of the circuit courts of the
counties of West Virginia, as ex officio chairmen of the
ballot commissioners of the counties, respectively, the pro-
posed amendment for submission to the voters at the
general election to be held on November 2, 1948?

The order refusing the writ in this case was entered
prior to the election on November 2, 1948, and as a result
thereof the respondent, the Secretary of State, did not
revoke his certificate to the various circuit clerks of the
State, and the proposed amendment was submitted to and
voted upon at the election held on November 2, 1948. Due
to the limited time between the entry of the order and the
election, this Court was unable, at the time of the entry
of the order, to file an opinion setting forth its reasons
for refusing the writ of mandamus prayed for in relators'
petition. While some people may have thought that the
question before us was whether the State of West Vir-
ginia would have, through the constitutional amendment,
available the sum of fifty million dollars for secondary
roads in the State, the real question here was whether the
neglect of an elected public official in failing to comply
literally with the provision of Section 6, Chapter 143, Acts
of the Legislature, 1947, and Section 2, Article XIV of the
Constitution, as to publication, precluded submission of
the question to vote.

This Court in *Herold v. Townsend, Tax Commissioner,*
113 W. Va. 319, 169 S. E. 74, is committed to two proposi-
tions: (1) That the provision of Section 2, Article XIV of

the Constitution as to the three months' publication of a proposed constitutional amendment is mandatory; and (2) that a literal compliance therewith is unnecessary, a substantial compliance being sufficient.

In our opinion, most, if not all, of the provisions of the Constitution are mandatory rather than directory, (1 Carrington, Cooley's Constitutional Limitations, Eighth Edition, 159), and some are so vital to the integrity of the Constitution itself that only a literal compliance therewith will suffice. Thus, the provision of Section 2, Article XIV of the Constitution that a proposed amendment, sought to be made without the use of a convention as provided under Section 1 of Article XIV thereof, must be assented to by two-thirds of the members elected to the Legislature, after being read on three separate days in each house and the proposed amendment, with the yeas and nays thereon, entered on the journals of both Houses; the provision that thereafter it shall be the duty of the Legislature to provide by law, for submitting the proposed amendment to the voters of the State for ratification or rejection at the next general election; and the provision that a majority of the qualified voters, voting on the question at the polls held pursuant to such law, shall be required to ratify the proposed amendment are so vital to the adoption of any constitutional amendment, under Section 2 of Article XIV, that a literal compliance therewith is required.

However, a literal compliance is not required with provisions of the Constitution which, though mandatory in their nature, are essentially procedural and only a part of the machinery or forms for the operation of the amendment of the Constitution. Judge Brewer, later Mr. Justice Brewer of the Supreme Court of the United States, in Constitutional Prohibitory Amendment Cases, 24 Kansas 700, 710, 711, said: "The two important, vital elements in any constitutional amendment, are, the assent of two-thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by

them, certainty as to the essentials is secured. But they are not themselves the essentials. Take a strong illustration: The Constitution requires that the 'secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding,' etc. Suppose a unanimous vote of both houses of the legislature, and a unanimous vote of the people in favor of a constitutional amendment, but that the secretary had omitted to publish in one county in which a newspaper was published, would it not be simply an insult to common sense to hold that thereby the will of the legislature and people had been defeated? Is it within the power of the secretary, either through ignorance or design, to thwart the popular decision? Is he given a veto, or can he create one?"

To illustrate this principle in our own State, looking to the question whether the constitutional provision as to the three months' publication requires only a substantial compliance, as held in the *Herald* case, let us also give a strong illustration: In a number of counties in this State there is only one newspaper published, and, while knowing personally most of the editors and owners of those newspapers, we do not think and do not infer that they would stand in the way of the voters of West Virginia in amending their fundamental law. If, however, a literal compliance with the constitutional provision as to publication was required, the owner or manager of a single newspaper, it being the only newspaper in the county of its publication, could, as long as he owned and managed that newspaper, by refusing to publish the Governor's proclamation as to a proposed amendment, prevent the submission thereof to the voters of the State, though the Governor's proclamation had been transmitted in ample time for three months' publication. If such refusal should occur, the circuit court of the county in which the newspaper is published would have no power by injunction to compel publication, because a court of equity has no jurisdiction to compel a newspaper editor or manager, who after all is a private citizen, to enter into a contract where

he has no duty to do so; and for the reason that the owner and manager of such newspaper is a private citizen and not a public officer, neither this Court nor the court of any county of proposed publication could issue a writ of mandamus to compel publication. By the same token, if the Governor, not through inadvertence, but for personal or political purposes, and in order to bring about the defeat of a proposed amendment, which he did not favor, should delay the sending out of the publication of proclamation until even a short time after the beginning of the three months' period, his neglect, under the literal compliance rule, would stand in the way of a valid submission of the proposed constitutional amendment to the voters of the State. Thus, the application of the literal compliance rule to the procedural provisions of Section 2, Article XIV of the Constitution, would permit private citizens, or a public officer, to unconscionably hold a veto on the power of the voters of the State to amend their Constitution, a veto certainly not contemplated by the framers of the Constitution, when Article XIV was adopted and incorporated therein.

When, however, we are applying, as we do here, the substantial compliance rule to the publication clause of Article XIV, we are not treading on new and uncertain ground. As heretofore indicated, the *Herold* case has definitely committed this Court to the application of that rule. This position is consonant with the great weight of authority in the United States.

The briefs filed by counsel for the relators and respondent indicate that counsel have made a rather exhaustive examination of the authorities, reference to some of which we deem it advisable to make in this opinion. In *State* v. *Winnett*, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A., N. S., 149, literal compliance with the Nebraska Constitution as to the publication of a proposed amendment would have required publication in at least one newspaper in each county of the State, where a newspaper was published, for three months immediately preceding the election. The election was to be held on November 6, 1906. In two

counties publication was first made on August 9, 1906, and in one county on August 10, 1906. In several counties publication was not made every week for four weeks, as required by the Constitution. Nevertheless, the Court, applying the substantial compliance rule, held that the requirement of the Constitution as to publication had been met. In *State ex rel. Hall* v. *Cline,* 118 Neb. 150, 224 N. W. 6, the court held that publication in one county for one week less than the required time, where the publication was regular in all other respects, was a substantial compliance. In *Manos* v. *State,* 98 Tex. Crim. App. 89, 263 S. W. 310, the Texas Constitution provided for publication once a week for four weeks, commencing at least three months before the election in one weekly newspaper in each county. The court held that there was substantial compliance with the Constitution, though in one county publication was only for three weeks and in four counties it was made less than three months before the election. *Fahey* v. *Hackmann,* 291 Mo. 351, 237 S. W. 752, is to the effect that where publication is required in each county for four weeks immediately prior to the election, publication in one county for only three weeks did not invalidate the election. In *State* v. *Smith,* 335 Mo. 840, 74 S. W. 2d 27, the Missouri Court, applying the substantial compliance rule, held that the election on an amendment to the Constitution was not invalidated because the four weeks' publication required by the Constitution was not immediately before the election, but the last publication was more than a week before. In *Doody* v. *State,* 233 Ala. 287, 171 So. 504, a proposed amendment to the Alabama Constitution was not published in one county in the state, notwithstanding the Constitution provides that a proposed constitutional amendment shall be published once a week in every county for eight successive weeks, prior to the election at which the amendment shall be voted on, and the court held that the publication was sufficient. So, the rule of substantial compliance, as applied to the publication provision of Article XIV of the Constitution, established by the *Herold* case, is supported by substantial authority in other jurisdictions.

What we have said concerning the effect of the refusal of a newspaper editor or owner to publish a proclamation which has been duly certified to him, applies to the Summers County situation. The proclamation was actually sent to the editor of a newspaper published in that county, though transmission was too late to meet the literal requirements of the Constitution. In our opinion, applying the substantial compliance rule, as we think we should do in the interest of good government, there being no showing that the voters were defrauded or misled by the failure of publication in that county, the failure to publish did not serve to vitiate the submission of the proposed constitutional amendment, under the reasoning heretofore suggested. If the failure to publish in that county had been the result of the fact that the proclamation had never been sent there, the situation confronting us would be entirely different.

However, relators attempt to distinguish the *Herold* case on two grounds: (1) That the tax limitation amendment involved in the *Herold* case hád been submitted to the voters, overwhelmingly adopted by the vote of the electorate, and declared the law before the attack on its validity; and (2) that the return of the respondent tax commissioner in the *Herold* case shows that the Governor had proceeded "with all possible dispatch to communicate with newspapers published in each and every county of the state * * * used every possible diligence to the end that such amendment might be published in conformity to the literal requirements of Section 2, Article XIV [of the] Constitution"; and that it was impossible in that case to comply literally with the constitutional provision as to publication, because the amendment was finally passed by the Legislature on August 6, 1932, and in a majority of the counties of the State no newspaper was published between August 6 to 8, inclusive. Nevertheless, the proposed amendment was actually published in every county ir the State on or before August 13, 1932.

The fact that in the *Herold* case the attack on the constitutionality of the amendment was not made until after

its adoption by popular vote and declared the law, is not controlling. It is true that if this case had arisen after the vote on the amendment, and this record disclosed that the amendment had been voted upon by a substantial vote and passed by a large majority, we would be aided by the rule that every reasonable presumption should be given to the adoption of an amendment, as in the case of every law. Authorities: 11 Am. Jur., Constitutional Law, §32; *Bott* v. *Wurts,* 63 N. J. L. 289, 43 Atl. 744; *Hammond* v. *Clark,* 136 Ga. 313, 71 S. E. 479.

It is also true that this Court in the *Herold* case relied upon the fact that the amendment was adopted by a substantial vote and had been declared the law. The fact that the tax limitation amendment was adopted by the voters, of course, is a strong indication that the people were not misled in voting or refraining to vote on the question of the adoption of that amendment, and the Court so held in the *Herold* case. After reciting that the constitutional limitation amendment was adopted by a vote of 335,482 to 43,931, this Court, in that case, at page 325 of the opinion, said: "Obviously the people of the state were not misled in any particular by the fact that the proposed amendment was not actually published at least three months before the election in some newspaper in every county in which a newspaper is printed." In the appraisal of a case such as this, it is important to ascertain whether the record discloses that the voters of West Virginia were not misled by the delay. If, in the instant case, it should appear to us, though there had been substantial compliance with the publication clause of Article XIV, there had been a misleading of the electorate in voting on or refraining to vote on the proposed amendment because of misinformation or lack of information due to the delay in publication, we would be bound in good conscience to declare the submission of the amendment invalid. The present proceeding, having been brought prior to the election on November 2, 1948, we are unaided by the result thereof. If, however, it was important in the *Herold* case to determine, partly on the basis of the result of the

vote on the amendment, whether the electorate was misled in the submission of the tax limitation amendment to the vote of the people, it is equally important in the appraisal of this case, which arose prior to the election and prior to the pronouncement of the extent of participation of the voters of West Virginia therein and the result thereof, to determine whether the delay of publication misled the people in their decision to vote on or refrain from voting on the question of ratification or rejection of the amendment.

We are not unaware of the allegations of respondent's answer to the effect that the proposed amendment was supported by the organizations of both major political parties in this State; that the amendment received favorable and unfavorable publicity by newspaper articles and editorials, radio addresses and political speeches, which no doubt accentuated in the minds of the people the failure of the Governor to make timely publication of the proposed amendment. In our opinion, in view of this widespread publicity, the voters of West Virginia were not misled in voting upon the proposed amendment. The object of the amendment, namely, a bond issue for fifty million dollars for use in the construction of secondary roads was undoubtedly of wide interest to all the people of the State, whether they resided in urban or rural sections thereof. We do not, however, desire to be understood to hold that publicity stands in lieu of the publication required by Section 2 of Article XIV of the Constitution. It is, however, important for the purpose of determining whether the delay in publication misled the electorate.

We think that the voters were not misled. If they had been misled, we should, though there had been a substantial compliance as to publication, declare the submission of the amendment invalid and unconstitutional; in which event the writ of mandamus should have issued.

Counsel for relators have directed our attention to two Kentucky cases, which they contend are applicable to the

case at bar. In *McCreary* v. *Speer,* 156 Ky. 783, 162 S. W. 99, the Court of Appeals of Kentucky, in an action originating in a circuit court seeking to enjoin the Governor of Kentucky from formally proclaiming that an amendment to the Kentucky Constitution had been adopted on the ground that there had been a failure to comply with that portion of the provision of the Constitution requiring the secretary of state to cause a proposed amendment to the Constitution "to be published at least ninety days before the vote is to be taken thereon * * * as may be prescribed by law", and the further failure to comply with a provision of the Kentucky statute (Ky. Statutes, Section 1459) that such publication should be at least four times in two newspapers of general circulation not later than ninety days preceding the election. The Court of Appeals held that the publication in two newspapers for sixty days before the election was not sufficient. However, the court did not consider whether the sixty-day publication was a substantial compliance with the Kentucky Constitution and statute. That case was argued, submitted and considered by the court only on the question whether the constitutional and statutory provisions as to publication were mandatory or directory; and on the basis of the holding that the provisions were mandatory, and on that alone, without any reference to the question of substantial or literal compliance, the court held the publication insufficient. Nowhere in the opinion was the question of substantial compliance mentioned. Query: Did not the Court inferentially hold that literal compliance was necessary?

The other case urged by counsel for relators as being directly applicable to the instant case is *Arnett* v. *Sullivan,* 279 Ky. 720, 132 S. W. 2d 76, in which it was held that the publication of a proposed constitutional amendment, first published seventy-three days before the election wherein the amendment was submitted to the voters, was insufficient. In that case appellant's counsel argued that the language of the Constitution, which is the same as under consideration in the *McCreary* case, is directory, and sole-

ly on that issue, the provision of the Kentucky Constitution as to publication was held mandatory and required a literal compliance therewith. The court there held that: "* * * the effort at compliance (substantial or literal) was never taken by the Secretary of State within the minimum period [90 days], and therefore, there has been no 'substantial compliance' with" the constitutional provision as to publication. "It follows, therefore", the Court further reasons, "that the argument of substantial compliance has no relevancy upon the legal issue, even if applicable in the determination of constitutional questions." If this premise of the Kentucky court is true, it seems that under the holding in the *Arnett* case a publication for eighty-nine days, instead of the required ninety days, would not be a sufficient compliance if the Secretary of State had made *no effort* to publish before the beginning of the ninety-day period. While it is not for this Court to undertake to say what the Kentucky Court of Appeals would do in a case in which the first effort to publish had been on the eighty-ninth day, it seems to us that the language of the opinion in the *Arnett* case is broad enough to indicate that the literal compliance rule as to publication of a proposed amendment to the Constitution has been applied and adopted. To that extent, the *Arnett* case is contrary to the holding of this Court in *Herold* v. *Townsend, supra.*

The controlling question in the instant case is whether a publication for sixty days prior to November 2, 1948, was a substantial compliance with Section 2 of Article XIV of the Constitution so as to justify the respondent O'Brien, as secretary of state, in certifying, as he did, to the various circuit clerks in the fifty-five counties of the State, the proposed amendment as to the fifty million dollar bond issue for secondary roads. We have found and have been cited to no case in any jurisdiction, which has adopted the substantial compliance rule as to publication of a proposed constitutional amendment, in which the sufficiency of a sixty-day publication has been decided upon. We realize that, notwithstanding the applicability of the substantial compliance rule, the case before

us is a borderline case. No matter what view we take, it will be met with well-meaning criticism, because at this late date there are thoughtful lawyers and students of constitutional law who might be called "strict constructionists". There are others, who just as earnestly may be of the opinion that, though the procedural provisions of the Constitution are mandatory, they require only a substantial compliance, as indeed was the holding of this Court in the *Herold* case. In some jurisdictions it has been held that the provisions of a state constitution as to amendments, are directory. Thus in *Commonwealth ex rel. the Attorney General* v. *Griest,* 196 Pa. 369, 46 A. 505, syl., the court held that: "The provision in article 18 as to the publication of a proposed amendment three months before the next general election should be regarded as merely a directory provision where strict compliance with the time limit is not essential." Consonant with the same view, see *People* v. *Cook,* 14 Barb. 259, 290, 8 N. Y. 67. We realize that: "* * * courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of the constitution." 1 Carrington, Cooley's Constitutional Limitations, Eighth Edition, 159. However, we are dealing with a provision of the Constitution itself, which, in this jurisdiction, has been held to be procedural, and, not subject to a literal compliance. In the determination of this case, we start with the premise that though the instant procedural provision of Section 2, Article XIV of the Constitution, as to publication, is mandatory, a literal compliance therewith is not required. Mr. Justice Brewer in Cases of Constitutional Amendments, *supra,* said: "Beyond * * * [the assent of two-thirds of the legislature and a majority of the popular vote] other provisions are mere machinery and forms. They may not be disregarded, because, by them, certainty as to the essentials is secured. But they are not themselves the essentials." In the instant case the two important and vital elements in Section 2 of Article XIV have been met: (1) the assent of the legislature by a two-thirds vote of the elected members of both Houses has

been given; and (2) the amendment was voted upon on November 2, 1948. The term "substantial compliance", of course, lends itself to no exact definition. For instance, this Court has held, as stated in the *Herold* case, that where the Governor has used due diligence, a publication which is timely in fifteen of the fifty-five counties, and of necessity about a week late in the other forty counties, was a sufficient compliance with Section 2 of Article XIV of the Constitution. On the other hand, we are not confronted with the question which was before the Supreme Court of Montana in *State ex rel. Woods* v. *Tooker*, 15 Mont. 8, 37 P. 840, in which it was held that a publication for two weeks before the election "and for no longer period" did not satisfy the provision of the Montana Constitution to the effect that a proposed amendment or amendments to the Constitution are to be published "in full in at least one newspaper in each county (if such there be), for three months previous to the next general election for members to the legislative assembly."

The three months' constitutional provision, involved here, was incorporated in the Constitution of 1863 without much debate. II Debates and Proceedings of the First Constitutional Convention of West Virginia, 348, 349, 350; III Id., 381, 387, 883, 884. In the Constitutional Convention of 1872, the foregoing provision was incorporated in our present Constitution. It is rather interesting to note that Peter G. Van Winkle, a delegate to the First Constitutional Convention from Wood County, and one of West Virginia's able lawyers in a day long gone by, as well as one or more of the other delegates to the convention, held the view that the time of publication should be one or two months instead of three months, and that was at a time when the State was sparsely settled and transportation, newspaper and communication facilities were meager indeed. However, what one or more of the several delegates to the first convention thought about the time of publication of a proposed amendment to the Constitution is of little service to our present day application of the publication provision. 1 Carrington, Cooley's Constitu-

tional Limitations, Eighth Edition, 142, 143, 144; 11 Am. Jur., Constitutional Law, Section 84, Note 13.

We are well aware of the cardinal principle of constitutional construction that effect be given to the intent of the framers of the organic law and of the people adopting it. 11 Am. Jur., Constitutional Law, Section 61. 1 Carrington, Cooley's Constitutional Limitations, Eighth Edition, 124, 125, 126 and 127. But, in this case we are called upon to interpret a procedural provision of the Constitution requiring only substantial compliance and to determine the effect of its application in the circumstances and conditions as portrayed by this record. The intent of the framers and the people who adopted the Constitution of this State evidently was to require such publication as would give to the voters notice, of an impending election on a proposed constitutional amendment, sufficient to permit them to make up their minds as to whether they would adopt or reject the amendment. That being so, we should apply the provision in question pragmatically and realistically to the accomplishment of the end and purpose for which it was incorporated in the Constitution. The term "substantial compliance" is a relative term whose very purport indicates that it should be applied to practical situations having in mind the purpose for which the provision as to publication was originally incorporated in the Constitution. By that token the meaning of the publication provision is not adamant or static, but is applicable to changing conditions, and in such application it is neither changeless or unchanged. Even as to the Constitution of the United States itself, though the wording remains unchanged, its provisions, especially those which are remedial or procedural, have and should be given such elasticity as to meet changing conditions. In *Euclid* v. *Ambler Co.*, 272 U. S. 365, 387, 47 S. Ct. 114, 71 L. Ed. 303, the Supreme Court of the United States, having under consideration the constitutionality of certain building regulations, said: "Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a cen-

tury ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. * * * while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning,* but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall." See also, *Merrick v. Halsey & Co.,* 242 U. S. 568, 37 S. Ct. 227, 61 L. ed. 498.

Keeping in mind that the intent and purpose of the publication provision question was to inform the voters of West Virginia in ample time, before a proposed constitutional amendment is to be voted upon, to make up their minds whether they would vote in favor of its adoption or rejection, we think that the allegations of respondent's answer as to the greatly increased and enlarged means of dissemination of knowledge, as compared with those available at the time the Constitutions of 1863 and 1872 were adopted, become most important in the application of the substantial compliance rule to the constitutional provision under consideration. At the time the present Constitution was adopted, the facilities of communication and transportation were meager indeed in comparison with those of today. What roads there were were of poor construction; the automobile, the radio and telephone were unknown; the publication of newspapers was far less extensive than it is today; and with the exception of the Baltimore and Ohio Railroad, running through northern West Virginia, the State was without any important railroad system. In those former days, most of the communication, especially through the central and southern parts of the State, was by river, and over unimproved roads and mountain trails, so what would be substantial compliance in these modern times would not be substantial compliance in 1863 and 1872 when the three months' pub-

lication provision was inserted in the Constitution. In our opinion, in view of the great change in the facilities of communication, transportation and dissemination, of knowledge, there has been such a substantial compliance as to publication with Section 2 of Article XIV of the Constitution that, in the absence of a showing that the delay in publication caused the voters to be defrauded, deceived or misinformed, the writ prayed for in relators' petition was properly refused. Though the widespread publicity of the proposed amendment, including that which resulted from the delay in the publication of the Governor's proclamation, as heretofore indicated, does not stand in lieu of the publication required by Article XIV of the Constitution, nor does it bear on the question whether there has been a substantial compliance therewith. But, because of it, we are not met with the question here whether the voters of West Virginia were, in fact, deceived or misled in voting for or against, or in failing to vote, on the proposed amendment. We are, of course, not aided in this case as this Court was in the *Herold* case, which was instituted after the people had voted on the constitutional amendment. Nevertheless, because there is no affirmative showing and no attack on the submission of the question as to the voters in this case on the basis that the voters were wrongfully misled or were misinformed or uninformed as a result of the official dereliction involved here, we are at liberty to apply the substantial compliance rule on the single question whether a sixty-day publication is sufficient.

In entering the order in refusing the writ, this Court did not indicate that the proposed constitutional amendment should be adopted or rejected by the voters of West Virginia. Our position then, as it is now, is that the electorate in West Virginia, being well informed as to the question involved, notwithstanding the delay in the official publication, had the right to vote on the proposed bond issue for the construction of secondary roads in this State. Perhaps it may be said that in making this decision we have gone as far as we should, and the question may

be raised as to where shall the line be drawn. Such a question has been raised in borderline cases, involving the interpretation or application of constitutional provisions, so many times that it has become trite. Confined as we are to the facts of the instant case, that question is unanswerable here, and we so leave it.

Our holding is that where, as here, the vital conditions as to the proposed amendment have been fully met, namely, the assent of elected members of both houses of the Legislature by a two-thirds vote, properly entered in the journals of both the House and Senate, and the procedural provision of Article XIV as to publication has been substantially complied with, the writ prayed for was properly denied by this Court's order of October 27, 1948.

*Writ denied.*

HAYMOND, JUDGE, dissenting:

Entertaining as I do a firm conviction that the decision in this proceeding violates both the letter and the spirit of a vital provision of the Constitution of this State, and strikes a violent blow against its continued integrity and existence, I respectfully dissent from the holding of the majority in denying the writ of mandamus prayed for in the petition. The decision in this case, in my opinion, offers the opportunity for other assaults upon the Constitution, which may be too powerful to be withstood, and presents the possibility, however presently remote, of the ultimate and final destruction of the very form of government which the Constitution creates, and which it was designed and intended to preserve and perpetuate. Though a single breach in any of its barriers against tyranny or oppression may not destroy the Constitution, repeated breaches will eventually bring about its complete and irreparable ruin. If one vital provision of the Constitution may be disregarded, circumvented, or violated, another provision or all its provisions may at any time meet the same fate. The solemn declarations of the people as embodied in the Constitution are of no force or effect if

any of them may be flouted, disobeyed, or ignored by anybody at any time or for any reason.

The importance and the possible disastrous effect of the present decision become clear when it is realized that the provision which it ignores is a provision which relates to the amendment of the Constitution, and in consequence necessarily involves its present and future vitality and existence. If, as the majority now holds, the Constitution can be amended in any particular after the publication of the proposed amendment for a period of approximately twenty-seven days less than the three months' period which the people prescribed in express terms, it can be amended after the publication of a proposed amendment for any other shorter period than three months, and by such means the people can be deprived of information respecting the intended change in the fundamental law, which they have created and adopted, and which they solemnly declared may only be changed in the manner which they have chosen and expressly prescribed and provided. If a publication for a period substantially less than three months will suffice, how much less than three months will also suffice; and if the publication for three months is not necessary, as the majority holds, will any publication at all actually be required? Or is the dissemination of information by other supposedly more effective or more modern means, instead of the publication expressly required by the Constitution, sufficient? If the answer to any of these questions is in the affirmative, as the majority answers with respect to a period of approximately twenty-seven days short of the required period of three months, then the will of the people, as expressly declared and stated in the Constitution itself, has been transgressed and disregarded.

In the face of the undisputed facts disclosed by the record and conceded in the argument, it can not be said, with any degree of reason, that publication of the proposed amendment for sixty-three days after its earliest publication on August 30, 1948, and for forty-six days after its latest publication on September 16, 1948, preced-

ing the date of the general election on November 2, 1948, instead of at least three months before that date, as required by the Constitution, is a substantial compliance with that requirement. In truth, these belated publications are not only not a substantial compliance, but are no compliance at all, with the express requirement of the Constitution, which the majority recognizes as mandatory in character. Can it be said, or argued, with any show of reason that the statutory requirement that a notice of motion for judgment in a civil proceeding be served upon a defendant twenty days before the hearing is substantially complied with if service be had nineteen days instead of twenty days before the hearing; or that a jury of eleven, instead of a jury of twelve, as required by the Constitution, for the trial of a person accused of a crime, substantially complies with that requirement? The mere statement of these questions conclusively answers them in the negative.

Not only is the holding of the majority unsound from the standpoint of reason, but it plainly is at variance with the express language of the Constitution itself. It violates the rule that the requirements established for the amendment of an existing Constitution are mandatory and must be strictly followed without the omission of any requisite step, and is contrary to decisions of appellate courts in some other jurisdictions in this country, in which the question here presented has been resolved or considered. *Arnett* v. *Sullivan,* 279 Ky. 720, 132 S. W. 2d 76; *McCreary, Governor* v. *Speer,* 156 Ky. 783, 162 S. W. 99; *State ex rel. Woods* v. *Tucker,* 15 Mont. 8, 37 P. 840, 25 L. R. A. 560. See also *Miller* v. *Johnson,* 92 Ky. 589, 18 S. W. 522, 15 L. R. A. 524; *Collier* v. *Frierson,* 24 Ala. 100; *Oakland Paving Company* v. *Hilton,* 69 Cal. 479, 11 P. 3; *Koehler* v. *Hill,* 60 Iowa 543, 14 N. W. 738, 15 N. W. 609; *State* v. *Tufly,* 19 Nev. 391, 12 P. 835, 3 Am. St. Rep. 895.

To say that an express requirement that the proposed amendment be published at least three months before the next general election, which the majority concedes is mandatory, is substantially complied with by a publica-

tion which is, in fact, only a few days more than two months before such election, is to disregard plain language and to ignore the clear and positive provision of the Constitution. No amount of mathematical dexterity or argumentative plausibility or persuasion can possibly make a period of approximately sixty days the substantial equivalent of at least three months. To my mind the question at issue is just that clear and just that simple. The situation here present is simply this: The publication requirement of the Constitution is clear and free from doubt and the proposed amendment was not published until August 30, 1948, when approximately twenty-seven days of the three months immediately preceding the general election in November had elapsed. In these circumstances, I can not approve or justify the holding of the majority that the delay in the publication for twenty-seven days of the three months' period constitutes a substantial compliance with the express publication requirement of Article XIV, Section 2, of the Constitution. On the contrary, the failure of the executive, through inadvertence, to cause the publication of the proposed amendment at least three months, and until only a few days more than two months, before the holding of the next general election, as expressly required by the provisions of Article XIV, Section 2, of the Constitution is not only not a substantial compliance with the requirement of the Constitution but is no compliance at all with that requirement. In 11 Am. Jur., Constitutional Law, Section 32, the rule which, in my judgment, directly applies to and controls the decision of this case is expressed in this language: "The general rule is that an amendment to a Constitution does not become effective as such unless it has been duly adopted in accordance with the provisions of the existing Constitution. The procedure and requirements established for the amendment of the fundamental law are mandatory and must be strictly followed, in order to effect a valid amendment. *None of the requisite steps may be omitted.*" (Emphasis supplied.)

As the publication requirement of the Constitution has not been complied with in any sense whatsoever, but has

been completely ignored and disregarded, the case of *Herold* v. *Townsend*, 113 W. Va. 319, 169 S. E. 74, which recognized and applied the rule of substantial compliance and sustained the adoption of the amendment there involved as valid, and the cases from other jurisdictions, cited and relied on by the majority, have no possible application to the case at bar. Another ground of distinction between this case and the *Herold* case is that in that case the voters had indicated that they had been adequately informed of the character of the proposed amendment by adopting it by a decisive vote of 335,482 to 43,931, or more than seven to one, whereas, in the case at bar, at the time of its submission and decision, the result of a vote upon the proposed amendment had, of course, not occurred and of necessity could not be ascertained or determined.

The simple issue here involved of the sufficiency of the publication of a proposed amendment within the clearly expressed meaning of a mandatory constitutional provision fixing a minimum period before the next general election for the publication of a proposed constitutional amendment, has been considered and resolved by the Court of Appeals of Kentucky in two cases which, as well considered and persuasive authority, should be decisive of this case, and, in my judgment, should impel this Court to grant the writ prayed for in the petition. In *McCreary, Governor* v. *Speer*, 156 Ky. 783, 162 S. W. 99, under a constitutional provision which required the publication of the proposed amendment to be made at least ninety days before the vote should be taken upon such amendment, the Court held that a publication sixty days before the election did not constitute a substantial compliance with the mandate of the Constitution, and, even though the proposed amendment carried by a vote of 65,978 to 32,478, declared it to be invalid. The Kentucky case just referred to was cited in the *Herold* case, and as to it this Court in the opinion, in distinguishing the two cases, used this significant language: "It must be observed, however, that in the Kentucky case *there was a very substantial deviation from the constitutional mandate as to publi-*

*cation."* (Emphasis supplied.) The foregoing quotation indicates clearly that this Court in the *Herold* case assumed an attitude respecting the Kentucky Court which is in marked contrast with that of the majority in the case at bar, which, by its labored attempt to avoid the pertinency and the force of the holding in the *McCreary* case, endeavors to create the inference that the Kentucky Court applied the rule of literal, instead of substantial, compliance with the constitutional mandate in arriving at its decision.

In the later Kentucky case of *Arnett* v. *Sullivan,* 279 Ky. 720, 132 S. W. 2d 76, the same Court held that the same constitutional provision involved in the *McCreary* case was not complied with by the first publication of a proposed constitutional amendment seventy-three days before the election. Notwithstanding the language of the Court in that case, quoted in part in the majority opinion, that "the effort at compliance (substantial or literal) was never taken by the Secretary of State within the minimum period, and therefore, there has been no 'substantial compliance' with" the constitutional provision, the majority indulges in the assumption that the Kentucky Court would apply the rule of literal construction and would hold, in the suppositious case stated in the opinion, that "a publication for eighty-nine days, instead of the required ninety days, would not be sufficient compliance if the secretary of state had made *no effort* to publish before the beginning of the ninety-day period." Inferences and pure speculation of the character just indicated can not, in my opinion, justify the conclusion reached by the majority, that a publication for approximately sixty days complied with or satisfied the mandatory requirement of the Constitution of publication of the proposed amendment *"at least* three months" before the next general election in some newspaper in every county in which a newspaper is published. (Emphasis supplied.) In the *Arnett* case the Court held that there had been no substantial compliance with the constitutional requirement and that the proposed amendment was for that reason of no force or effect. Whether

the Kentucky Court would, or this Court should, follow and apply the principle of substantial compliance in the case at bar is of no importance for the reason that there has been no compliance whatsoever with the publication requirement of Article XIV, Section 2, of the Constitution.

It will not do to say, as does the majority, that the constitutional provision in question was first incorporated in the Constitution of 1863 "without much debate"; or that a shorter period than three months was suggested and rejected; or that "the intent and purpose of the publication provision in question was to inform the voters of West Virginia in ample time, before a proposed constitutional amendment is to be voted upon, to make up their minds whether they would vote in favor of its adoption or rejection"; or that at the time the present Constitution was adopted "the facilities of communication and transportation were meager indeed in comparison with those of today"; or that, in effect, a different, better, and more effective method of informing the voters than that expressly provided by the Constitution has been resorted to in connection with the proposed amendment and that the people of West Virginia are as well or even better informed with respect to it as they would have been if the method required by the Constitution had been used; and that, for those reasons, the plain mandate of the fundamental law may be ignored and disregarded in changing and amending it. Such expressions are merely the sounding brass and the tinkling cymbal of lack of appreciation of consequences of grave and perilous importance. Substantially the same argument was presented in the case of *Arnett* v. *Sullivan,* 279 Ky. 720, 132 S. W. 2d 76, and rejected by the Kentucky Court in these words: "The argument is unconvincing either from a logical or precedent standpoint." The conclusive answer to the foregoing statements is that though zeal for progress and improvement, such as a popular project for good roads throughout the State, may engender the belief that the present publication requirement of the Constitution is outmoded and less desirable than other publication methods of more modern

use and development, there is no other method recognized or authorized by the Constitution, and that the method which it provides can not be ignored and disregarded or replaced by any supposedly more desirable substitute in any manner other than that which the Constitution expressly prescribes.

Back of the effort to submit the proposed amendment is the commendable and popular desire to make prompt and effective provision for more and better roads within this State. Good roads are desirable and progress and development depend in large measure upon the creation and the maintenance of an adequate and modern road system. But the preservation of the integrity of the Constitution, subject only to its amendment in the manner prescribed by its terms, is essential to the continued governmental existence of the State, without which roads, whether good or bad, would be of little use to the people of West Virginia. Rome had good roads, some of which still remain; but Rome had no firm or enduring constitution to safeguard the liberty of her people. The roads remain for the use of other peoples, but all that remains of the ancient Roman state which built them is its recorded history. I favor good roads, but I would not acquire them by a method not authorized by the Constitution of this State or at the unnecessary risk of imperilling and undermining that fundamental law. Without such risk, the proposed amendment can be adopted with comparatively little delay by the voters, if they desire to do so, at the general election in 1950, after appropriate legislative action and after compliance with the publication requirement of Article XIV, Section 2, of the Constitution.

Unless plain and simple words have entirely lost their meaning, and are to be given no force or effect whatsoever, Article XIV, Section 2, of the Constitution requires the publication of the proposed amendment at least three months before the next general election. No more clear, familiar, definite, or explicit language can well be imagined or employed to accomplish the manifest purpose of that provision of the Constitution. In *Harbert* v. *The*

30

*County Court of Harrison County,* 129 W. Va. 54, 39 S. E.
2d 177, with reference to the Constitution of this State,
this Court said: "The Constitution of this State is the
supreme law of West Virginia; it is subject only to the
Constitution of the United States and the laws of the
United States which shall be made in pursuance thereof,
and all treaties made or which shall be made, under the
authority of the United States, all of which constitute the
supreme law of the land. United States Constitution,
Article VI, Clause 2. The Constitution of West Virginia
is binding upon all the departments of government of this
State, all its officers, all its agencies, all its citizens, and
all persons whomsoever within its jurisdiction. The three
branches of our government, the legislative, the executive,
and the judiciary, alike derive their existence from it; and
all of them must exercise their power and authority under
the Constitution solely and strictly in accordance with the
will of the sovereign, the people of West Virginia, as ex-
pressed in the basic law. It is the solemn duty of this
Court, its creature, to obey and give full force and effect
to all its terms and provisions." The people, in adopting
the Constitution expressly required the publication of any
proposed amendment for at least three months before the
next general election before such amendment could be
adopted and made effective as part of the basic law of
this State. The meaning of this requirement is positive
and it is plainly expressed. The expression "at least three
months" means a minimum period of three months. It
does not mean a substantially shorter period. A period
of approximately three days more than two months is not
"at least three months" and a publication for the shorter
period clearly does not satisfy, either literally or sub-
stantially, or in any degree or sense whatsoever, the re-
quirement of Article XIV, Section 2, of the Constitution,
which every public officer in this State has sworn to
support.

When a written instrument expresses its purpose and
intent in clear and unambiguous terms, as does the con-
stitutional provision involved in this proceeding, the

courts will not resort to construction but will give force and effect to the instrument according to its provisions. See *Kanawha Banking and Trust Company* v. *Gilbert,* 131 W. Va. 88, 46 S. E. 2d 225. "Where the terms of a writing are plain and unambiguous, there is no room for construction, since the only office of judicial construction is to remove doubt and uncertainty." 12 Am. Jur., Contracts, Section 229. In point 3 of the syllabus in *Chesapeake and Ohio Railway Company* v. *Miller, Auditor,* 19 W. Va. 408, this Court said: "When the text of a constitutional provision is plain and unambiguous, courts in giving construction thereto are not at liberty to search for its meaning beyond the instrument itself." In considering the meaning and the effect of Section 14, Article VII, of the Constitution, in *May* v. *Topping,* 65 W. Va. 656, 64 S. E. 848, this Court used this language: "The plain terms of this constitutional provision should prevail. A Constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be derived at is that of the people, and it is not to be supposed that they have looked for any dark or obstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' Cooley's Const. Lim. 81. The great Chief Justice Marshall, in the interpretation of a provision of the national Constitution, said: 'As men whose intentions require no concealment generally employ the words which most distinctly and aptly express the ideas they intend to convey, the enlightened patriots who adopted it must be understood to have employed words in their natural sense, and to have intended what they said.' *Gibbons* v. *Ogden,* 9 Wheat. 188. There is no ambiguity in Section 14, of Article 7. It is plain. It needs no construction."

The established and well recognized rule relating to the effect to be given to plain and unambiguous language of constitutional provisions, which directly applies in this case, is stated in 11 Am. Jur., Constitutional Law, Section 64, in these words: "It is a general principle that the intention to which force is to be given is that which is embodied and expressed in the constitutional provisions themselves; for words are the common signs that mankind make use of to declare their intention to one another. When the words of a man express his meaning plainly, distinctly, and perfectly, there is no occasion to have recourse to any other means of interpretation. The court, therefore, in construing a constitutional enactment, is usually said to be limited to the language of the enactment itself. It may not be governed by what the framers of the amendment might have meant to say, but is of necessity controlled by what they did say. The rule is sometimes stated more completely that a constitutional provision which is positive and free from all ambiguity must be accepted by the courts as it reads. In such a case no construction is permissible, and there is no excuse for interpolation or addition. In other words the courts are not at liberty to search for its meaning beyond the instrument, nor are they at liberty, by a resort to the refinements of legal learning, to restrict an obvious meaning." In 12 C. J. 703, the statement is: "While it is the duty of the courts to ascertain and carry into effect the intent and purpose of the framers of a constitution, this intent must be that which they have embodied in the instrument itself. To ascertain the meaning of a constitution, therefore, the first resort in all cases is to the natural signification of the words used, in the order and grammatical arrangement in which the framers have placed them. If, thus regarded, the words used convey a definite meaning which involves no absurdity and no contradition between parts of the same writing, then the meaning apparent on the face of the instrument is the one which alone courts are at liberty to say was intended to be conveyed. And the meaning, when so ascertained, must be taken as the authoritative rule. There is no occasion for construction in such cases,

and it is not allowable." See also 16 C. J. S., Constitutional Law, Section 19a.

In the opinion in *Bee* v. *City of Huntington,* 114 W. Va. 40, 71 S. E. 539, this Court used this language: "Regarding constitutional construction, this court said, in *C. & O. Ry. Co.* v. *Miller,* 19 W. Va. 408, 419: 'Where the text is plain and unambiguous, courts are not at liberty to search for its meaning beyond the instrument itself.' This rule was emphasized by the New York Court in *Newell* v. *People,* 7 N. Y. 9, 97, as follows: 'That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have a right to add to or take away from that meaning.' The doctrine, thus stated, is universal. Cooley's Constitutional Limitations (8th Ed.), 124, etc.; 12 C. J. 703; *Board of Commissioners* v. *Rollins,* 130 U. S. 662, 32 L. Ed. 1060. The 'plain and unequivocal language' of the amendment, as was said in the *Finlayson* case, 'leaves no room for interpretation'. We cannot, under such circumstances, weigh the policy of the legislature. Our duty, as pointed out in *People* v. *Draper,* 15 N. Y. 532, 546, is merely 'the humble one of construing the constitution by the language it contains.'" The rule was recognized and stated in these words in the well considered Texas case of *Cox* v. *Robison,* 105 Tex. 426, 150 S. W. 1149: "The fundamental rule for the government of courts in the interpretation or construction of a constitution is to give effect to the intent of the people who adopted it. The meaning of a constitution is fixed when it is adopted; and it is not different at any subsequent time when a court has occasion to pass upon it. *People* v. *Blodgett,* 13 Mich. 127. Where its terms are plain and definite, that which the words declare is the meaning of the instrument. In such cases there is no room for construction; the words of the instrument lie before the court already molded to their use, and its province extends no further than the enforcement of the language as written." Under the rule stated in the cited texts and cases, this Court should give full force and effect to the constitutional provision which expressly requires publication of a proposed amendment

at least three months before the next general election, and should not construe it to mean a substantially shorter period of time.

With full recognition that the admitted failure to cause publication of the proposed amendment at least three months before the general election in November, 1948, resulted solely from an unintentional and regrettable oversight upon the part of some official in the executive department, I would apply, in the decision of this case, the principles expressed in this language in *Arnett v. Sullivan,* 279 Ky. 720, 132 S. W. 2d 76: "Written constitutions in governments adopting them, charter the course to be followed by all agencies and departments operating under them, as well as the people composing the government. * * *. If a particular constitution contains provisions not adaptable to changed present conditions there is always found in it means and methods by which it may be amended, *and no court should approve any other method of amendment than the one or ones so prescribed.*" (Emphasis supplied.)

As the publication requirement of the Constitution respecting the proposed amendment has not been complied with, either literally or substantially, the submission of the amendment to the voters and its adoption by them at the election in November, 1948, would, in my opinion, be unauthorized and of no binding or valid force or effect. For that reason I would award the writ of mandamus prayed for in the petition.