## Keck, Com'r of Highways, v. Manning, Com'r of Finance

July 6, 1950

W. B. Ardery, Judge

434

Hazelrigg & Cox, Louis Cox, and John Hopkins, for appellant.

A. E. Funk, Attorney General, M. B. Holifield, Assistant Attorney General, and W. C. Hamilton, Jr., for appellee.

CHIEF JUSTICE SIMS—Reversing.

This declaratory action involves the construction

of Sec. 230 of the Kentucky Constitution, as amended in 1944, which reads:

"No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law; and a regular statement and account of the receipts and expenditures of all public money shall be published annually. No money derived from excise or license taxation relating to gasoline and other motor fuels, and no monies derived from fees, excise or license taxation relating to registration, operation, or use of vehicles on public highways shall be expended for other than the cost of administration, statutory refunds and adjustments, payment of highway obligations, costs for construction, reconstruction, rights-of-way, maintenance and repair of public highways and bridges, and expense of enforcing state traffic and motor vehicle laws."

The commissioner of highways sought to have the chancellor declare that the commissioner of finance should authorize the payment out of highway funds of certain bills the highway department had incurred in the printing and distribution of road maps, bulletins, booklets, photographs and advertisements concerning the highways in the State, copies of which were filed with the petition as exhibits. The chancellor sustained a general demurrer to the petition and when appellee refused to plead further dismissed it, which was tantamount to deciding that payment for the items just mentioned out of highway funds was a diversion thereof in contravention of Sec. 230.

The petition avers that the publication and distribution of the above mentioned exhibits are necessary for the maintenance and administration of the highway system in that this printed matter largely regulates and controls traffic, since heavy trucks are thereby directed to use such routes as are most suitable from the standpoint of construction and safety and are thus notified they must not use other routes not safe or suitable for heavy loads and upon which only light traffic is permitted. Various sections of the statutes are pleaded, such as KRS 176.050 authorizing the department to publish from time to time bulletins containing useful information concerning the construction and maintenance of roads; KRS 176.060 relating to the regulation of traffic over roads under construction; KRS 177.046 relating to

establishing and maintaining signs and markers; KRS 177.240 and 177.290 authorizing limited-access facilities and designating such separate roadways and the maintaining of local service roads and streets; and KRS 189.230 and 189.340 prescribing load and speed limits and designating lanes and road to be used by slow-moving traffic.

It is further averred in the petition that the maps, booklets, photographs and advertisements, based upon a recognized formula, brought 5 million outstate tourists and travelers into Kentucky who bought 86,964,928 gallons of gasoline upon which they paid a tax of $6,087,545 into the state road fund during the year 1949; that the gasoline tax bears a direct relationship to the extent and method of informing the general public of the character, condition and routing of the highways in the Commonwealth in the manner set forth in the exhibits filed with the petition.

At this point, we call attention to the fact that the department receives and expends a vast amount of money annually — in round numbers $30 million — the greater part of which comes from the gasoline tax. Assuming for the sake of argument that all of the $30 million receipts come from gasoline taxes, then according to the averments of the petition $6 million, or one-fifth of our entire road fund, is the indirect result of the outstate tourists and travelers attracted to Kentucky by the exhibits filed with the petition, the cost of publication and distribution of which is relatively nothing in comparison with the huge amount of revenue they attract into the road fund.

The purpose of the 1944 amendment, often referred to as the "anti-diversion amendment," was not to curtail the road program but to make secure the funds with which to continue it. Through excise taxes on gasoline and license taxes on motor vehicles tremendous sums are brought into the state treasury. In some states part of this money has been used for education, welfare or social security programs and other governmental expenses. The amendment was supported by the motor vehicle interests to prevent this fund, raised by special taxes levied against them, from being put to uses having no connection with the construction, maintenance and administration of the highway system. Manifestly, it was

not the intention of the amendment to impede the department in insuring the road fund, or increasing it, by the publication and distribution of information concerning our highways.

An examination of Sec. 230 of our Constitution reveals that its framers made no attempt to specify for just what the road fund may be expended. On the contrary, they used the broadest terms, such as "the cost of administration * * * construction, reconstruction, rights-of-way, maintenance * * * and expense of enforcing state traffic and motor vehicle laws."

In Grauman v. Department of Highways, 286 Ky. 850, 151 S. W. 2d 1061, 1062, there was before us the question of whether a traffic light furnished the department by Jefferson County came within the term "construction and maintenance," and we held the term broad enough to include everything appropriately connected with safety and convenience of traffic and incidental to the construction and maintenance of an efficient highway system. The Grauman case was followed with approval in Rice v. Marcum, 294 Ky. 486, 172 S. W. 2d 75.

In Crick v. Rash, 190 Ky. 820, 229, S.W. 63, 66, we held that part of the proceeds of a bond issue voted for the "building, construction, (and) reconstruction of roads" could be used in paying reasonable broker's fees for the sale of the issue.

Also, see Steinfeld v. Jefferson County Fiscal Court, 306 Ky. 621, 208 S.W.2d 939, 940, where it was held that under KRS 67.080 (9) authorizing the county to provide for "the good condition of the highways of the county" it might maintain a garbage disposal to prevent garbage and debris from being thrown in road ditches. It was there written: "The phrase 'good condition' certainly should not be construed so strictly as to prevent an otherwise well constructed and maintained highway, insofar as paving is concerned, to be allowed to become unsightly by permitting all kinds of debris and garbage to litter its drainage ditches and even its pavement."

It is familiar law that courts in construing constitutional provisions will look to the history of the times and the state of existing things to ascertain the intention of the framers of the Constitution and the people

adopting it, and a practical interpretation will be given to the end that the plainly manifested purpose of those who created the Constitution, or its amendments, may be carried out. Rouse v. Johnson, 234 Ky. 473, 28 S. W. 2d 745, 70 A.L.R. 1077; Warfield Natural Gas Co. v. Ward, 286 Ky. 73, 149 S. W. 2d 705; Meredith, Atty. Gen. v. Kauffman, 293 Ky. 395, 169 S. W. 2d 37, 39. As was written in the Kauffman case, ''The Constitution is concerned with substance and not with form and its framers did not intend to forbid a common-sense application of its provisions.''

Applying the law to the averments of the petition, we have not the least difficulty in reaching the conclusion that Sec. 230 will not be violated by expenditures for the publication and distribution of truck and highway maps of the state, albeit the latter are printed with attractive and colored pictures showing some of the shrines, playgrounds and places of interest in Kentucky. Both of these maps show the condition and suitability for travel of the highways throughout the Commonwealth. A traffic manager of a trucking firm in a distant city or state with the aid of the truck map can route his vehicles through Kentucky with accuracy and precision and determine from it where they are at all times and if necessary, where he may communicate with the drivers thereof. Certainly, truck and road maps are a proper item of expense against the highway fund and they may fall under the broad terms of ''maintenance'' or ''administration,'' since these words mean more than the actual construction and repair of roads and they apply to the routing and control of traffic over them and to obtaining revenue from the highway system. Our highway system could hardly be maintained or administered without the publication of maps. The fact that these maps are gotten up in such form as to arouse the interest of and to attract tourists, as well as to help them in locating, reaching and visiting points of interest in our State, does not prevent the maps from being a proper charge against the road fund.

What has been said of colorful and attractive maps also applies to the booklet issued by the department. On the first inside page thereof is this statement: ''This booklet has been prepared as a concise, serviceable guide to scenic and historic attractions to be found along Kentucky Highways. Descriptive route logs of through

roads and selected photographs are submitted as Kentucky's invitation to visitors. A new state highway map, to be found inside the back cover, will provide accurate and comprehensive highway conditions data."

This booklet, or pamphlet, not only calls attention to a new highway map showing the condition of the roads, but there is printed in it on a double page a map of Kentucky showing some of the attractions and places of interest in the State and the routes to be traveled in reaching them. This little booklet gives the location of towns and cities on the various routes and the distances between them and is of much assistance to residents as well as to tourists and visitors. It assists in safely directing and distributing traffic over our roads, and since the administration of the highway system is concerned with the safety of travelers, which requires it to consider "traffic density or intensive use by the traveling public," we think the publication of this booklet may be properly classed as an item of administrative expense. See Ashland Transfer Co. v. State Tax Commission, 247 Ky. 144, 149, 56 S. W. 2d 691, 87 A.L.R. 534, which, though not directly in point, supports our reasoning.

What gives us more concern are the two copies of paid advertisements which were published in a dozen motor magazines and in two national magazines. One of these exhibits is headed "3 Greatest All In Kentucky." Then follows a few words blocked out in separate squares making reference to the Kentucky Derby, Mammoth Cave and Kentucky Lake. Under these blocks and at the bottom of the advertisement is:

"Write today for FREE copy of beautiful four-color Booklet and colored Map of Kentucky's Parks, Shrines and scenic Highways.

Name ————————————————
Street ————————————————
City ———————————— State————————

       Kentucky Department of Highways
       Division of Public Information
       Frankfort, Kentucky."

The other exhibit is headed: "You'll love your vacation in glamorous, historic Kentucky," under which are pictures of My Old Kentucky Home, Kentucky Lake

and Cumberland Falls. This second advertisement ends with the same invitation to write for a map as appears on the first.

It is common knowledge that such natural wonders as Mammoth Cave and Cumberland Falls, not to mention the Kentucky Derby, My Old Kentucky Home and Kentucky Lake, as well as the birthplaces of the immortal Lincoln and the great Jefferson Davis, attract untold thousands of motorists to our State each year. Is it not better to inform these visitors in advance through such advertisements how and where they can obtain road maps of the State and pamphlets showing the location of these places they want to see and the routes to be traveled in reaching them, than it is to have them visiting Kentucky and traveing our highways unarmed with maps and the information they need? Indeed, it is of assistance to our own citizens to have visitors furnished with correct information as to the routes of our highways they desire to follow.

If there were a catastrophe wherein roads were made impassable and bridges destroyed, would the department not be justified in warning outstate travelers of that fact by advertisements rather than having them arrive in great numbers, snarling and confusing traffic by using dead-end roads? Surely, if the department can inform prospective outstate users of our roads when they are closed and unfit for travel, it can in the proper administration of the highway system likewise inform such persons by advertisements when the roads are in good condition and may be traveled with safety and comfort.

Learned counsel representing the commissioner of finance interpolate into the case an Act passed by the 1950 General Assembly permitting such expenditures as those we are now considering, and argue that the Act contravene secs. 59, 60, 19 and 247 of our Kentucky Constitution. Also, that KRS 146.060 and 147.050 authorize the Division of Publicity to advertise to tourists the attractions of the state. But these constitutional and statutory sections have no application to the instant case since the petition filed asks a declaration as to whether expenditures from highway funds for maps, photographs, booklets and advertisements in magazines are an unconstitutional use of such funds under sec. 230

of our Constitution. This litigation arose before the 1950 Act became effective, and the petition does not mention it or the other constitutional or statutory sections argued by appellee, and as we are considering the sole question of whether the petition is good on demurrer, appellee may not rightly raise issues other than those set out in the petition.

The judgment is reversed and the chancellor is directed to enter one overruling the demurrer and declaring that the commissioner of finance pay the accounts of the highway department for the printing and distribution of the maps, booklets and photographs, as well as for the advertisements, filed with the petition as exhibits.