434 S.E.2d 357

CONTRACTORS ASSOCIATION OF WEST VIRGINIA, a West Virginia Corporation, and the Flexible Pavements Council of West Virginia, an Unincorporated Association, Plaintiffs Below, Appellees,

v.

WEST VIRGINIA DEPARTMENT OF PUBLIC SAFETY, DIVISION OF PUBLIC SAFETY; J.R. Buckalew, Superintendent of West Virginia Department of Public Safety; West Virginia Department of Transportation, Division of Motor Vehicles; and Jane Cline, Commissioner of the West Virginia Department of Transportation, Division of Motor Vehicles, Defendants Below, Appellants.

No. 21519.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 2, 1993.

Decided March 25, 1993.

Brotherton, Justice Dissenting Aug. 23, 1993.

Darrell V. McGraw, Jr., Atty. Gen., Silas B. Taylor, Sr. Deputy Atty. Gen., Charleston, for appellants.

John Philip Melick, Thomas E. Potter, Jackson & Kelly, Charleston, for appellees.

McHUGH, Justice:

This case is before the Court upon the appeal of the West Virginia Department of Public Safety, Division of Public Safety; J.R. Buckalew, Superintendent of the West Virginia Department of Public Safety, Division of Public Safety; West Virginia Department of Transportation, Division of Motor Vehicles; and Jane Cline, Commissioner of the West Virginia Department of Transportation, Division of Motor Vehicles, the defendants below, from the December 4, 1992 order of the Circuit Court of Kanawha County which granted summary judgment to the appellees and held that certain statutes were in violation of the *West Virginia Constitution.* The appellees and plaintiffs below are: Contractors Association of West Virginia, a West Virginia corporation, and the Flexible Pavements Council of West Virginia, an unincorporated association.

## I.

The appellees, which are in the business of constructing and repairing state highways, filed a declaratory action in order to determine whether or not the reimbursements to the Department of Public Safety violate *W.Va. Const.* art. VI, § 52, which prevents the diversion of funds from highways, or whether the reimbursements exceed the scope of *W.Va.Code,* 15–2–12(i) [1990], which authorizes reimbursements to the Department of Public Safety for services relating to the duties of the Division of Motor Vehicles. Since July 1, 1990, pursu-

ant to *W.Va.Code,* 15–2–12(i) [1990],[1] the Department of Public Safety has sent invoices for reimbursement to the Division of Motor Vehicles for the following activities: road patrol, traffic, traffic court, operator examinations, and assistance to the Division of Motor Vehicles with its administrative functions. The appellees also questioned whether the following five statutes violate *W.Va. Const.* art. VI, § 52:

1. *W.Va.Code,* 17C–16–5 [1987], which involves the collection of inspection sticker fees and the operation and construction of police barracks;[2]

2. *W.Va.Code,* 17A–3–3(a)(7) [1984], which involves the collection of registration fees in order to regulate the compulsory insurance program;

3. *W.Va.Code,* 17B–1D–7 [1990], which involves motorcycle licensing fees and the motorcycle safety program and licensing program;

4. *W.Va.Code,* 17A–4–10(c) [1990], which involves fees from salvage and reconstructed vehicle inspections; and

5. *W.Va.Code,* 17A–6B–3(b) [1990], which involves the collection of a license service certification fee.[3]

Both parties moved for summary judgment since there were no disputed issues of fact. The only evidence before the circuit court were the pleadings, three affidavits, and admissions by the State.

The circuit court granted the appellees' motion for summary judgment and found that the above six statutes violate *W.Va. Const.* art. VI, § 52 for two reasons. Number one, the revenues contemplated by the statutes were derived from taxes on fuels or motor vehicles, therefore the expenditure of those revenues are restricted by the language of *W.Va. Const.* art. VI,

§ 52. Number two, the purposes for which the revenues were appropriated under the challenged statutes were impermissible since the expenditures were neither "costs of administration and collection," nor "maintenance of public highways." The circuit court also found that certain payments made by the Division of Motor Vehicles to the Department of Public Safety exceed the scope of payments authorized by *W.Va.Code,* 15–2–12(i) [1990].[4] For reasons set forth below, we reverse, in part, and affirm, in part.

## II.

Initially, the focus of this opinion will be on *W.Va. Const.* art. VI, § 52, which states:

> Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels shall, after deduction of statutory refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued or which may be hereafter issued for the construction, reconstruction or improvement of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways.

(emphasis added). Although the issues in this case are inextricable, for purposes of legal analysis, it is desirable to conduct a two-phase inquiry in order to determine whether or not any of the six statutes violate *W.Va. Const.* art. VI, § 52. First,

---

1. *W.Va.Code,* 15–2–12 was amended in 1991 after this case was filed; however, the amendments did not affect subsection (i).

2. *W.Va.Code,* 17C–16–5 [1987] was amended in 1992 though the amendment does not affect our discussion.

3. The appellants in their brief to this Court state that annual appropriations in excess of nine million dollars ($9,000,000) are at issue.

4. The appellees also claimed that reimbursements for the patrol and traffic enforcement duties of the Department of Public Safety exceeded the scope of *W.Va.Code,* 17–3–1 [1967] (involving the state road fund) (17–3–1 was amended in 1991); however, the circuit court did not address this issue because of its ruling on the other two claims.

are the expenditures of funds described in each statute restricted by *W. Va. Const.* art. VI, § 52? Yes, the expenditures of funds described in each statute are restricted since the funds are "[r]evenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, ... [or] revenue derived from motor vehicles or motor fuels[.]"

Second, and the more difficult question to answer, is whether the restricted revenue is being expended in one of the following manners authorized by *W. Va. Const.* art. VI, § 52: "[as] statutory refunds and cost of administration and collection ... [or for the] construction, reconstruction, repair and maintenance of public highways[?]" Yes, the restricted revenue is being expended in a manner authorized by *W. Va. Const.* art. VI, § 52 with the exception of the funds used for the maintenance and operation of police barracks.

The appellees argue that the expenditures authorized by the above six statutes are funds derived from sources named in the constitutional provision, and the expenditures are not the "cost of administration" nor are they being used for the purposes of "construction, reconstruction, repair or maintenance of public highways[.]" Therefore, the appellees conclude the statutes violate *W. Va. Const.* art. VI, § 52. We disagree with the appellees in part.

At the outset we point out that this issue concerns funds which are part of the state road fund which is codified at *W. Va. Code,* 17–3–1 [1967] and has been in existence since 1921. *See West Virginia Acts* 1920–21, c. 112, § 15. Currently, *W. Va. Code,* 17–3–1 [1967] makes it clear that certain monies derived from automobile or motor driven vehicle related taxes and fees are to be used for only three purposes:

(a) To pay the principal and interest due on all state bonds issued for the benefit of said fund, and set aside and appropriated for that purpose; (b) to pay the expenses of the administration of the road department; (c) to pay the cost of maintenance, construction, reconstruction and improvement of all state roads.

However, in 1942 *W. Va. Const.* art. VI, § 52 was ratified in order "to prevent diversion by the legislature of funds derived from the sources named in the constitutional provision [*W. Va. Const.* art. VI, § 52] to purposes other than the construction, reconstruction, repair and maintenance of public highways...." *Charleston Transit Company v. Condry,* 140 W.Va. 651, 659–60, 86 S.E.2d 391, 397 (1955). Obviously, the citizens of West Virginia found it necessary to add art. VI, § 52 to our *Constitution* in order to ensure that the purpose of the state road fund was not thwarted by the legislature.

Therefore, in our analysis of the six statutes we must examine each statute to ascertain whether or not the legislature is circumventing the purpose of *W. Va. Const.* art. VI, § 52. However, we also note that "[e]very reasonable construction must be resorted to by a court in order to sustain constitutionality and any doubt must be resolved in favor of the constitutionality of the legislative enactment in question." *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 747, 143 S.E.2d 351, 357 (1965).

Before we begin our analysis we also point out that in syllabus point 4 of *State ex rel. Smith v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142 (1965), we stated:

'Though it is a cardinal rule of constitutional construction to give effect to the intent of the framers of the Constitution and the people who adopted it, new and changing conditions not existing at the time the Constitution was adopted should be looked to and applied in the interpretation of a procedural provision of the Constitution.' [citation omitted]

When *W. Va. Const.* art. VI, § 52 was adopted, the interstates did not exist, nor did the powerful cars which have since been developed. At the time the constitutional provision was written, the writers' major concern was concrete: the building of roads. With the development of a vast interstate system and more powerful cars which travel at high rates of speed, our concern has changed and is more focused on safety and the costs to administer the

vast highway system in order to protect our highway users. With this background, we will now discuss our first phase of inquiry.

### A.

Our first phase of inquiry involves the following section of *W. Va. Const.* art. VI, § 52: "[r]evenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels[.]" In order for *W. Va. Const.* art. VI, § 52 to apply, the six statutes must involve revenue described in the above section of the constitutional provision. Although the appellants concede that the expenditure of fees outlined in four of the statutes are restricted by *W. Va. Const.* art. VI, § 52, the appellants argue that the expenditure of fees outlined in *W. Va. Code*, 17A–6B–3(b) [1990], *W. Va. Code*, 17A–4–10(c) [1990], and *W. Va. Code*, 15–2–12(i) [1990], are not restricted under the constitutional provision.

■ *W. Va. Code*, 17A–6B–3(b) [1990] involves the collection of a $25.00 fee from businesses wishing to engage in the license service business. The fee is to be used by the Division of Motor Vehicles to administer its licensing of the license service businesses. The appellants argue that the $25.00 fee is a business license tax. We disagree. The fee is a licensing fee related to motor vehicles; therefore, the fee is revenue which can only be spent for the purposes outlined in *W. Va. Const.* art. VI, § 52.

■ *W. Va. Code*, 17A–4–10 [1990] involves the collection of a $35.00 fee for the inspection of salvaged or reconstructed vehicles. The fee is to carry out the provisions of *W. Va. Code*, 17A–4–10 [1990]. The appellants argue that the fee is payment for a service rather than "revenue derived from motor vehicles." We disagree. The $35.00 fee is money derived from a motor vehicle; therefore, the fee is also revenue which can only be spent for purposes outlined in *W. Va. Const.* art. VI, § 52.

*W. Va. Code*, 15–2–12(i) [1990] is implemented by funds from the state road fund. However, there is no language in *W. Va. Code*, 15–2–12(i) [1990] which indicates that the funds used are derived from the revenue listed in *W. Va. Const.* art. VI, § 52. However, since we find *W. Va. Code*, 15–2–12(i) [1990] constitutional in our second phase of inquiry, we need not address this issue in our first phase of inquiry.[5] We will assume that *W. Va. Code*, 15–2–12(i) [1990] involves funds described in the constitutional provision.

The appellants concede that the other statutes are funded with revenue which can only be spent for purposes outlined in *W. Va. Const.* art. VI, § 52. Therefore, we conclude in our first phase of inquiry that all of the questioned statutes involve funds described in *W. Va. Const.* art. VI, § 52 with the exception of *W. Va. Code*, 15–2–12(i) [1990] which, for purposes of our analysis, we will assume involves funds described in the constitutional provision.

### B.

Our second phase of inquiry, and obviously the more difficult, involves the mean-

---

**5.** The appellants argue that even if the reimbursements by the Division of Motor Vehicles to the Department of Public Safety under *W. Va. Code*, 15–2–12(i) [1990] are not authorized by *W. Va. Const.* art. VI, § 52, the reimbursements from the state road fund are allowed because other revenue besides the revenue listed in *W. Va. Const.* art. VI, § 52 makes up the state road fund.

As part of that argument the appellants discuss certain federal funds which become part of the state road fund. James J. Haley, Business Manager for the West Virginia Division of Highways, in paragraph six of his affidavit stated that the federal funds which become part of the state road fund "consists of funds (excluding 'Restricted' revenue) received from federal reimbursement grant programs, which reimburse the State for 75%–100% of the sums previously expended by the State on certain qualifying road and highway projects." Part of Title 23 of the United States Code involves the funding of highway projects. However, we will not address the issue of whether or not the expenditures of those federal funds deposited in the state road fund are restricted by *W. Va. Const.* art. VI, § 52 because of our holding that the questioned funds are being expended for purposes authorized by *W. Va. Const.* art. VI, § 52.

ing of two phrases in *W.Va. Const.* art. VI, § 52: "Revenue . . . shall, after deduction of . . . [1] cost of administration and collection . . . be appropriated and used solely for [2] construction, reconstruction, repair, and maintenance of public highways[.]" The two phrases outline the expenditures authorized under *W.Va. Const.* art. VI, § 52. Since we have concluded all six statutes involve revenue which is derived from motor vehicles, then the expenditures authorized by the six statutes *shall only* be used for one of the purposes outlined in *W.Va. Const.* art. VI, § 52.

■ Initially, we should address the meaning of the phrase "cost of administration." The appellees argue that the clause "cost of administration" only refers to the costs of administering the state road fund. We disagree.

■ At the outset we note that "[q]uestions of constitutional construction are in the main governed by the same general rules as those applied in statutory construction." *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973). In syllabus point 2 of *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968), we stated: "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Therefore, if the language in a constitutional provision is clear and without ambiguity, the plain meaning is to be accepted.

We find the clause "cost of administration" to be clear and without ambiguity. In *State ex rel. State Building Commissioner v. Moore*, 155 W.Va. 212, 229, 184 S.E.2d 94, 104 (1971), we pointed out that *W.Va.Code*, 17-3-1 [1967] implemented *W.Va. Const.* art. VI, § 52 and that *W.Va. Code*, 17-3-1 [1967] states, in part, that one of the purposes of the state road fund is "to pay the expenses of the administration of the road department[.]" (emphasis omit-

ted). Since *W.Va.Code*, 17-3-1 [1967] was originally enacted, the road department has been dissolved and the Division of Motor Vehicles has taken over many of its duties.[6] *W.Va.Code*, 17A-2-22 [1951] was enacted to ensure that the Division of Motor Vehicles was properly funded: "The expense of the administration of the motor vehicle department shall be appropriated for that purpose from the state road funds." Obviously, the legislature has determined that the cost of administering the duties of the Division of Motor Vehicles should be paid from the state road fund.

As we pointed out earlier, the purpose of art. VI, § 52 is to prevent the diversion of highway funds. Using the state road fund to pay the cost of administering the duties of the Division of Motor Vehicles would not circumvent the purpose of *W.Va. Const.* art. VI, § 52 since the duties of the Division of Motor Vehicles are directly related to our public highways. Therefore, common sense allows us to conclude that the clause "cost of administration" in *W.Va. Const.* art. VI, § 52 means the cost of administering the duties of the Division of Motor Vehicles.

■ Second, we address the meaning of the phrase "construction, reconstruction, repair and maintenance of public highways." The appellants argue that "maintenance of public highways" includes activities which make our public highways safer. We agree.

We have construed the phrase "construction, reconstruction, repair and maintenance of public highways" on two noteworthy occasions in the past. The first occasion was in *State ex rel. Appalachian Power Co. v. Gainer, supra.* In *Gainer* this Court held that the cost of relocating public utility facilities in connection with a federal highway project could be paid from the state road fund and that such payment was an obligation incurred in the construction of public highways. Although this

---

**6.** For example, *W.Va.Acts* 1920-21, c. 112, § 15 puts the state road commission in "charge of the administration of the vehicle laws of this State, including the collection of all license fees[.]" According to the appellant's brief, in 1933 the powers of the state road commission were transferred to the state road department. Today, those duties are now imposed on the Division of Motor Vehicles. *E.g., W.Va.Code*, 17A-3-3 [1984].

Court did give great weight to the legislative declaration in *W. Va. Code,* 17-4-17b [1970] that the cost of relocating utility facilities is a cost of highway construction, this Court noted "that the provision creating the road fund contemplates more than actual construction, reconstruction or repair of public highways in a strict sense of such terms." *Id.* 149 W.Va. at 754, 143 S.E.2d at 361.

The second occasion was in *State ex rel. State Building Commissioner v. Moore,* 155 W.Va. at 230, 184 S.E.2d at 105, in which we held:

that the cost of the construction, maintenance and operation of an office building and related facilities for the sole and exclusive use and occupancy of the West Virginia Department of Highways constitutes a reasonable, necessary and proper *incident* of the construction, reconstruction, repair and maintenance of the public highway system of the state in conformity with the provisions, intent and purpose of Section 52 of Article VI of the Constitution of West Virginia ... [and] that such cost may properly be paid from the State Road Fund[.]

(emphasis added). In *Gainer* and *Moore* we made it clear that the phrase "construction, reconstruction, repair and maintenance of public highways" means more than the actual physical construction of the highway. This Court, therefore, has on previous occasions found that the costs of activities which are directly related to the construction, reconstruction, repair and maintenance of public highways are payable from the state road fund.

However, whether highway safety is sufficiently related to maintenance of public highways is a question of first impression. Although we have found that "construction, reconstruction, repair and maintenance of public highways" means something more than actual physical construction, we will not circumvent the purpose of *W. Va. Const.* art. VI, § 52 by finding purposes for the expenditure of revenue which are not authorized by the constitutional provision. On the other hand, we will not unduly burden the legislature with a narrow construction which will add to the already difficult financial condition of this State. With that background, we must address whether highway safety is sufficiently related to "maintenance" of public roads. This issue depends upon the meaning of the word "maintenance" in the constitutional provision.

In *Pauley v. Kelly,* 162 W.Va. 672, 699, 255 S.E.2d 859, 874 (1979), we stated:

There are four traditional methods of judicial definitions of words used in statutes and constitutions and not specifically defined in them: dictionary definitions current at the time, and those now extant; pronouncements by courts; reliable extra-judicial commentary; and definitions set or [inferable] from debates and proceedings of the bodies that drew the documents.

We have both a dictionary definition and pronouncements by other courts to guide us.

*Webster's Third New International Dictionary* 1362 (1970) defines "maintenance" as "the labor of keeping something (as buildings or equipment) in a state of repair or efficiency...." The use of the word "maintenance" in *W. Va. Const.* art. VI, § 52 indicates that it means to keep our highways efficient since the constitutional provision specifically uses the term "repair." A primary way of keeping our highways efficient is to promote safety by enforcing traffic regulations or by requiring safety courses. In fact, the federal government's definition of maintenance in 23 U.S.C. § 101(a) (1988) which follows, indicates that the word maintenance means more than just keeping the physical aspects of a highway in repair: "The term 'maintenance' means the preservation of the entire highway, including surface, shoulders, roadsides, structures and such traffic-control devices as are necessary for its safe and efficient utilization."

Courts from other jurisdictions which have considered this issue have interpreted the term maintenance to mean more than the repair or upkeep of the physical aspects of a highway. For instance, in *Rich v. Williams,* 81 Idaho 311, 341 P.2d 432 (1959)

the court held that the construction of an office building for the joint use of the Department of Highways and the Department of Law Enforcement constituted "maintenance of public roads." Although the appellees correctly point out that *Idaho Const.* art. VII, § 17, the comparable constitutional provision, is broader than our constitutional provision since it states that the state road fund can only be used for the "construction, repairs, maintenance and *traffic supervision,*" the Idaho Court in *Rich* relied on the meaning of the term maintenance and not the phrase traffic supervision when making its decision. (emphasis added). The Idaho Court concluded that the term maintenance encompassed any activity related to ensuring an efficient road system.

Similarly, in *Keck v. Manning,* 313 Ky. 433, 231 S.W.2d 604 (1950) the court held that the phrase "construction and maintenance" included the printing and distribution of road maps, booklets, photographs, and advertisements of the state's highways since that phrase was broad enough to include everything connected with safety and convenience of traffic. Although section 230 of the *Kentucky Constitution* is broader than our constitutional provision since state road funds can be used to "[enforce] state traffic and motor vehicle laws[,]" the court in Kentucky relied on the phrase "construction and maintenance" of highways in order to conclude that expenses for activities incident to safety could be paid for out of the road fund.

Therefore, other courts have construed the term maintenance to mean more than the physical repair or upkeep of the public highways. However, we disagree with the broad application of the term "maintenance" by the courts in *Rich* and *Keck.* If the purpose of the constitutional provision is to prevent the diversion of highway funds, then the use of the funds must be directly related to the efficiency of the highway and not remotely related. We do

not find, as the court in *Rich* did, that the construction of an office building for the use of the Department of Law Enforcement to be directly related to the efficiency of the highway. Nor do we agree with the court in *Keck* that the word "maintenance" encompasses anything incidental to an efficient highway system. The courts in *Rich* and *Keck* have given a broad interpretation to the word "maintenance." We find their interpretation of "maintenance" circumvents the purpose of *W. Va. Const.* art. VI, § 52. Therefore, we choose to take a more restrictive, but nevertheless a common sense approach to the interpretation of the word "maintenance." Although we do find that the term "maintenance" encompasses safety activities which are necessary for an efficient road system, under our common sense approach we find that the safety activity must be *directly related* to the efficiency of the highway. Our holding today in no way gives the legislature permission to creatively find ways to divert highway funds.

Now, we will examine each statute to see if the expenditures authorized are for one of the purposes outlined in *W. Va. Const.* art. VI, § 52.

i.

■ *W. Va. Code,* 15–2–12(i) [1990] states:

The *superintendent [of Public Safety] shall be reimbursed by the division of motor vehicles ... for services performed by such members [of the Division of Public Safety] relating to the duties and obligations of the division of motor vehicles* set forth in chapters seventeen ..., seventeen-a, seventeen-b, seventeen-c and seventeen-d of this code.

(emphasis added). The Division of Motor Vehicles has reimbursed the Department of Public Safety for the following activities pursuant to *W. Va. Code,* 15–2–12(i) [1990]: road patrol, traffic, traffic court, operator examinations, and assisting the Division of Motor Vehicles in its administrative duties.[7]

---

7. In the "Defendants' Answer to Plaintiffs' First Request for Admission" the appellants admitted that the activities listed on the invoices submitted to the Division of Motor Vehicles included the following:

1. *road patrol:* includes all time actually spent by the Department of Public Safety on patrol, including radar operation, but does not include hours spent by the Department of Pub-

We find that the road patrol, traffic, and traffic court activities of the Department of Public Safety directly affect the safety of our highways. Those activities are necessary in order to ensure that the public abides by laws which directly enhance the safety of our highways. Therefore, the reimbursements for the road patrol, traffic, and traffic court activities of the Department of Public Safety are expenditures authorized by *W.Va. Const.* art. VI, § 52 since they are necessary for the maintenance of an efficient highway system.

We also find that the reimbursements for assisting the Division of Motor Vehicles to be constitutional since those activities involve the licensing and registration functions of the Division of Motor Vehicles. As we pointed out earlier, any duty of the Division of Motor Vehicles is the "cost of administration." Therefore, reimbursements to the Department of Public Safety for activities involving the duties of the Division of Motor Vehicles are the "cost of administration," and are therefore constitutional.[8]

ii.

■ *W.Va. Code*, 17C–16–5 [1987] states, in pertinent part:

The superintendent of the department of public safety shall be responsible for the inspection as provided in this article and shall prescribe requirements and qualifications for official inspection stations. He shall select and designate such stations and shall issue permits therefor and furnish instructions and all necessary forms thereto for the inspection of

vehicles as herein required and the issuance of official certificates of inspection and approval.... *A charge of one dollar per sticker shall be charged by the department of public safety to the inspection station, and the funds so received shall be deposited* into the state treasury and credited to the account of the department of public safety *for application in the administration and enforcement of the provisions of this article. Any balance remaining in the fund* on the last day of June of each fiscal year, *not required for operating expenses, construction, repairs or alterations of police barracks for the ensuing fiscal year and for the administration and enforcement of the provisions of this article, shall be transferred to the state road fund.*

(emphasis added). This section concerns inspection sticker fees. To the extent the fees collected are used to enforce and administer the provisions of *W.Va. Code*, 17C–16–5 [1987], they are the cost of administration since the statute provides funds to carry out the duties of the Division of Motor Vehicles. Therefore, the statute is constitutional.

■ However, the use of the fees to operate, repair, or construct police barracks is not proper since the fees are not being used for one of the purposes outlined in *W.Va. Const.* art. VI, § 52. Although the state police do perform activities which directly affect the safety of highways, the construction and operation of police barracks is not directly related to maintaining

---

lic Safety personnel in traveling to specific assignments;

2. *traffic:* includes accident investigations, interviews of accident participants, completion of accident reports, directing and escorting traffic, serving traffic warrants, presenting safety talks, and assistance of motorists;

3. *traffic court:* includes all hours spent by the Department of Public Safety personnel in court proceedings involving traffic violations, as well as all travel to and from those proceedings;

4. *operator examinations:* includes all Department of Public Safety hours spent conducting operator examinations and conducting driver clinic interviews; and

5. *assisting the Division of Motor Vehicles:* includes all hours spent in issuance of Depart-

ment of Motor Vehicles forms, one trip permits, VIN verification, serving revocation orders and assisting the public with problems relating to licensure and registration.

8. We point out that although the appellees' complaint that the reimbursements for the patrol and traffic enforcement duties of the Department of Public Safety exceed the scope of *W.Va. Code,* 17–3–1 [1967] was not raised on appeal, the issue would be resolved by our finding that maintenance includes activities directly related to highway safety since *W.Va.Code,* 17–3–1 [1967] specifically states, in part, that the monies in the state road fund may be used "to pay the cost of maintenance[.]"

our public highways. We want to make it clear that our holding that maintenance of public highways includes activities directly related to ensuring highway safety is not to be interpreted as giving the legislature permission to fund any activity which is remotely connected to highway safety. The construction and operation of police barracks is clearly not directly related to ensuring highway safety. Therefore, the use of fees for the construction and operation of police barracks violates *W.Va. Const.* art. VI, § 52.

### iii.

■ *W.Va.Code,* 17A–3–3(a)(7) [1984] provides:

> (7) Each such *application for registration shall be accompanied by* the fees hereafter provided, and an additional *fee of one dollar for each motor vehicle for which* the applicant seeks registration, *such fee to be deposited* in a special revolving fund *for the operation by the [Division of Motor Vehicles] of its functions established by the provisions of article two-A [§ 17D-2A-1 et seq.], chapter seventeen-D of this Code:* Provided, That July one, one thousand nine hundred eighty-five, the additional fee will reduce to and remain at fifty cents.

(emphasis added). This code section allows the Division of Motor Vehicles to collect a fee which is to be used to administer *W.Va. Code,* 17D–2A–1, *et seq.* which involves the compulsory insurance program. The Division of Motor Vehicles is responsible for administering the compulsory insurance program. For instance, *W.Va.Code,* 17D–2A–8 [1982] authorizes the commissioner of the Division of Motor Vehicles to promulgate rules which are necessary for "the administration, operation and enforcement of the provisions of this article [chapter 17D, article 2A of the *W.Va.Code,* which involves the compulsory insurance program.]" Accordingly, we find that *W.Va. Code,* 17A–3–3(a)(7) [1984] is constitutional

since it involves the cost of administering the duties of the Division of Motor Vehicles.

### iv.

■ *W.Va.Code,* 17B–1D–7 [1990] states:

> (a) There is hereby created a special fund in the state treasury which shall be designated the 'motorcycle safety fund.' The fund *shall consist of all moneys received from motorcycle driver licensing fees* except instruction permit fees, one half of the moneys received from the motorcycle safety fee assessed with each motorcycle registration under section three-b [§ 17A–10–3b], article ten, chapter seventeen-a of this code and any other moneys specifically allocated to the fund. The fund shall not be treated by the auditor and treasurer as part of the general revenue of the state. The *fund shall be* a special revolving fund to be *used and paid* out upon order of the commissioner of motor vehicles solely *for the purposes specified in this chapter.*
>
> (b) The *fund shall be used by the division of motor vehicles to defray the cost of implementing and administering the motorcycle safety education program* established in section two [§ 17B–1D–2], article one-d of this chapter. *Moneys* in the special revolving fund *may also be used to defray the cost of implementing and administering the motorcycle driver licensing program.*

(emphasis added). The fees authorized by this code section are to be used to create a motorcycle safety education program and to administer a motorcycle driver licensing program. The motorcycle safety education program is to be administered by the commissioner of the Division of Motor Vehicles. *W.Va.Code,* 17B–1D–2 [1990]. The motorcycle licensing program is also to be administered by the Division of Motor Vehicles. *W.Va.Code,* 17B–2–7(b) [1981].[9] Therefore, the use of the fees authorized by *W.Va.Code,* 17B–1D–7 [1990] does not

9. *W.Va.Code,* 17B–2–7(b) was amended in 1992 though the amendment does not affect our discussion.

violate *W.Va. Const.* art. VI, § 52 since the fees are to be used to administer a duty of the Division of Motor Vehicles and are, therefore, the "cost of administration."

v.

■ *W.Va.Code*, 17A–4–10(c) [1990] states:

(c) The *division shall charge a fee of fifteen dollars for the issuance of each salvage certificate* but shall not require the payment of the five percent privilege tax. However, upon application for a certificate of title for a reconstructed vehicle, the division shall collect the five percent privilege tax on the fair market value of the vehicle as determined by the commissioner unless the applicant is otherwise exempt from the payment of such privilege tax. A wrecker/dismantler/rebuilder is exempt from the five percent privilege tax upon titling a reconstructed vehicle. *The division shall collect a fee of thirty-five dollars per vehicle for inspections of reconstructed vehicles. These fees shall be deposited in a special fund created in the state treasurer's office and may be expended by the division to carry out the provisions of this article.* Licensed wreckers/dismantlers/rebuilders may charge a fee not to exceed twenty-five dollars for all vehicles owned by private rebuilders which are inspected at the place of business of a wrecker/dismantler/rebuilder.

(emphasis added). We hold that the use of the fees authorized by *W.Va.Code*, 17A–4–10(c) [1990] does not violate *W.Va. Const.* art. VI, § 52 since the fees are to be used to administer a duty of the Division of Motor Vehicles, and are, therefore, the "cost of administration."

vi.

■ *W.Va.Code*, 17A–6B–3 [1990] states:

(a) The initial application fee for a certificate to engage in the license service business is twenty-five dollars. The renewal fee for such certificate is twenty-five dollars.

(b) There is hereby created in the treasury a special fund, named the '*motor vehicle license service administration fund,*' into which shall be paid all of the initial licensing fees, the renewal licensing fees, and certified copies fees. The commissioner of motor vehicles shall use the moneys in this account to administer and enforce the provisions of this article.

(emphasis added). We hold that *W.Va. Code*, 17A–6B–3 [1990] does not violate *W.Va. Const.* art. VI, § 52 since the fees authorized by the statute are used to administer a duty of the Division of Motor Vehicles.

Accordingly, we hold that the only purposes for which the funds described in *W.Va. Const.* art. VI, § 52 may be spent are for the "cost of administration and collection" and for the cost of "construction, reconstruction, repair and maintenance of public highways." The term "cost of administration" includes the cost of administering the duties of the Division of Motor Vehicles. The term "maintenance" includes the following activities which are directly related to ensuring the safety of our public highways: the road patrol, traffic, and traffic court activities of the Department of Public Safety; and the motorcycle safety and licensing program, but the term "maintenance" will not be construed to include activities which are remotely connected to highway safety such as the construction and operation of police barracks.

III.

■ Next, we focus our attention on *W.Va.Code*, 15–2–12(i) [1990], which states:

(i) The *superintendent shall be reimbursed by the division of motor vehicles* for salaries and employee benefits paid to members of the division of public safety, and shall either be paid directly or reimbursed by the division of motor vehicles for all other expenses of such group of members in accordance with the actual costs determined by the superintendent, *for services performed by such members relating to the duties and ob-*

ligations of the division of motor vehicles set forth in chapters seventeen [§§ 17-1-1 et seq., 17A-1-1 et seq., 17B-1-1 et seq., 17C-1-1 et seq. and 17D-1-1 et seq.], seventeen-a, seventeen-b, seventeen-c and seventeen-d of this code.

(emphasis added). The issue now before us is whether certain payments made by the Division of Motor Vehicles to the Department of Public Safety for the following activities exceed the scope of payments authorized by *W.Va.Code,* 15-2-12(i) [1990]: road patrol, traffic, traffic court, operator examinations, and assistance to the Division of Motor Vehicles with its administrative duties. In the preceding discussion we found that the payments made by the Division of Motor Vehicles to the Department of Public Safety pursuant to *W.Va.Code,* 15-2-12(i) [1990] to be constitutional since the purpose of the payment was to maintain an efficient highway system and to pay the "cost of administration." The issue now before us will be easily resolved since we have already found that the activities of the Department of Public Safety are necessary in order to protect our highway users.

The appellees argue that the activities listed on the invoices to the Division of Motor Vehicles are solely the authorized duties of the Department of Public Safety, therefore, the activities, with the exception of operator examinations,[10] are not related to the duties of the Division of Motor Vehicles within the meaning of *W.Va.Code,* 15-2-12(i) [1990]. We disagree.

The basis of the appellee's argument is *W.Va.Code,* 17C-2-3 [1982] which states: "[i]t shall be the duty of the department of public safety and its members to enforce the provisions of this chapter [which involves traffic regulations and laws] and other laws of this State governing the operation of vehicles upon the streets and highways of this State...." We agree that the activities listed on the invoices involve enforcing traffic regulations which is the duty of the Department of Public Safety

under *W.Va.Code,* 17C-2-3 [1982]. However, *W.Va.Code,* 15-2-12(i) [1990] simply states that the Department of Public Safety shall be reimbursed for services *"relating* to the duties and obligations of the division of motor vehicles[.]" (emphasis added). *W.Va.Code,* 15-2-12(i) [1990] does not state that the Department of Public Safety must be performing services which are the duties of the Division of Motor Vehicles.

This issue hinges on what the legislature meant by the phrase "relating to" in *W.Va. Code,* 15-2-12(i) [1990]. In *Amick v. C & T Development Co., Inc.,* 187 W.Va. 115, 118, 416 S.E.2d 73, 76 (1992), this Court stated "that generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for the general and proper use of such words." The ordinary meaning of "relating to" is that there is a connection between two subjects, not that the subjects have to be the same. For instance, *Black's Law Dictionary* 1158 (5th ed. 1979) gives the following definition for relate: "To stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with; with 'to.'"

Therefore, under *W.Va.Code,* 15-2-12(i) [1990] services by the Department of Public Safety only need to be connected to the duties of the Division of Motor Vehicles before the Department of Public Safety can be reimbursed. We find that the duties of the two agencies are connected because the activities of one has a bearing on the activities of the other.

For example, the Division of Motor Vehicles' involvement with the traffic laws and regulations that the Department of Public Safety is to enforce is reflected in chapter 17C of the *W.Va.Code.* Specifically, the Department of Public Safety enforces *W.Va.Code,* 17C-4-1 [1951] which concerns accidents involving death or personal injuries. However, it is the commissioner of the Division of Motor Vehicles who revokes

---

**10.** The circuit court found that Department of Public Safety invoices to the Division of Motor Vehicles for operator examinations are specifically authorized under *W.Va.Code,* 15-2-12(h) [1990].

the driver's license of a person convicted for failing to stop and cooperate after being involved in a motor vehicle accident which results in injuries or death under *W. Va. Code,* 17C–4–1(c) [1951].

Another example involves the "point system" set forth by the Division of Motor Vehicles in 91 *W. Va. C.S.R.* §§ 5–7.1 to 5–7.15 (1992). The regulations outline a recordkeeping system whereby the Division of Motor Vehicles assigns points for traffic convictions. If a person receives a certain amount of points the Division of Motor Vehicles will suspend that person's license. The Department of Public Safety's enforcement of traffic regulations results in traffic convictions which the Department of Public Safety reports to the Division of Motor Vehicles so that the Division of Motor Vehicles can determine whether or not to revoke a person's driver's license. Therefore, the Department of Public Safety aids the Division of Motor Vehicles in determining who should have the privilege of driving on our highways.

Similarly, the Department of Public Safety enforces *W. Va. Code,* 17C–5–7 [1986] which involves the steps to be taken if a person arrested for DUI refuses to submit to a chemical test. Under *W. Va. Code,* 17C–5–7 [1986], the Department of Public Safety has the authority to notify the Division of Motor Vehicles of the person's refusal to submit to a chemical test. *W. Va. Code,* 17C–5–7 [1986] also gives the Division of Motor Vehicles the authority to revoke a person's driver's license for refusing to submit to a chemical test. The legislature envisioned the Department of Public Safety and the Division of Motor Vehicles working together in order to stop people from driving under the influence of alcohol, controlled substances, or drugs. In recent times our society has increasingly become aware of the dangers posed by a drunk driver. We point out that in order to protect our highway users from the dangers posed by a drunk driver, it is necessary to adequately fund the road patrol activities of the Department of Public Safety. As we noted in our preceding discussion, the term "maintenance" in *W. Va. Const.* art. VI, § 52 includes activities which directly

ensure highway safety. Clearly, patrolling the highways in order to remove drunk drivers directly ensures highway safety.

Therefore, it is clear that both agencies need each other in order to carry out the administration of the laws in chapters 17A through 17D of the *West Virginia Code.* The Division of Motor Vehicles grants a license conditioned on the observance of laws governing highway safety which the Department of Public Safety enforces.

Accordingly, we hold that the reimbursements by the Division of Motor Vehicles to the Department of Public Safety for the following activities: road patrol, traffic, traffic court, operator examinations, and assistance to the Division of Motor Vehicles with its administrative duties are authorized by *W. Va. Code,* 15–2–12(i) [1990] because the above activities are "related" to the duties of the Division of Motor Vehicles since the Department of Public Safety is responsible for enforcing traffic laws and regulations which the Division of Motor Vehicles has the duty to administer.

### IV.

We hold that *W. Va. Code,* 15–2–12(i) [1990]; 17A–3–3(a)(7) [1984]; 17B–1D–7 [1990]; 17A–4–10(c) [1990] and 17A–6B–3(b) [1990] are constitutional under *W. Va. Const.* art. VI, § 52. We hold that *W. Va. Code,* 17C–16–5 [1987] violates *W. Va. Const.* art. VI, § 52 to the extent it authorizes the use of revenue collected from motor vehicles to operate, construct or repair police barracks. Furthermore, we find that the reimbursements by the Division of Motor Vehicles to the Department of Public Safety for activities described as road patrol, traffic, traffic court, operator examinations, and assisting the Division of Motor Vehicles with its administrative functions do not exceed the scope of *W. Va. Code,* 15–2–12(i) [1990]. Based upon the foregoing, the December 4, 1992 order of the Circuit Court of Kanawha County is affirmed, in part, and reversed, in part.

Affirmed, in part; reversed, in part.

BROTHERTON, Justice, dissenting:

"Our cup runneth over!" exclaimed the Executive and Legislative branches of our State government after reading the majority opinion. Never has the "horn of plenty" produced such a cornucopia of gifts, all delivered sua sponte and unexpectedly by a judiciary, which, incidentally, is elected and sworn to uphold the Constitution of the State of West Virginia.

This case evolves from legislation enacted during the 1990 legislative session to give salary increases to the uniformed members of the Department of Public Safety. I do not dispute the need for a salary increase. What I do dispute is the method by which the increase was funded. Because of budgetary constraints, the Legislature felt it could not fund the salary increases out of the general revenue budget. Consequently, legislation was enacted that would allow the Department of Motor Vehicles to pay the salary increases out of monies collected from the highway user tax on gasoline.[1] The Department of Public Safety would submit vouchers to the DMV for time that Department members spent providing "highway safety activities" on the state highways. These vouchers were not to exceed the amount the Legislature had determined was sufficient to pay the salary increases. To aid in this budgetary manipulation, the Legislature included a line item in the Department of Motor Vehi-

cles' budget which was identified simply as "unclassified."

After this legislation was enacted, the petitioners brought this action, in which they alleged that the use of the gasoline tax for the Department salary increase was unconstitutional because it violated restrictions set forth under Article VI § 52 of the West Virginia Constitution which specify that gasoline and other motor fuel excise and license taxes are to be used *solely* for construction, reconstruction, repair, and maintenance of public highways.

In his 1993 State of the State message to the Legislature, the Governor emphasized the need for this State to come up with large sums of highway construction monies in order to maximize the amount of matching funds West Virginia would receive from the federal government. This was to be achieved by legislating a $.05 per gallon gasoline tax. Needing full support for the gasoline tax, the 1994 budget bill presented to the Legislature at the conclusion of the Governor's State of the State message completely reversed the prior funding scheme and provided that the Department of Public Safety salary increases be paid out of the general revenue part of the budget[2] and took no funds from the highway users taxes. In other words, the salary increase was to come from general revenue funds and not the constitutionally restricted gasoline tax. This deviation would hopefully secure the petitioners support for the pro-

---

**1.** *See* W.Va.Code §§ 15–2–12(h) and (i), which provide:

(h) The superintendent may also assign members of the division to administer tests for the issuance of commercial drivers' licenses, operator and junior operator licenses as provided for in section seven [§ 17B–2–7], article two, chapter seventeen-b of this code: Provided, That the division of motor vehicles shall reimburse the division of public safety for salaries and employee benefits paid to such members, and shall either pay directly or reimburse the division for all other expenses of such group of members in accordance with actual costs determined by the superintendent.

(i) The superintendent shall be reimbursed by the division of motor vehicles for salaries and employee benefits paid to members of the division of public safety, and shall either be paid directly or reimbursed by the division of motor vehicles for all other expenses of such

group of members in accordance with actual costs determined by the superintendent, for services performed by such members relating to the duties and obligations of the division of motor vehicles set forth in chapters seventeen, seventeen-a, seventeen-b, seventeen-c and seventeen-d [§ 17–1–1 et seq., § 17A–1–1 et seq., § 17B–1–1 et seq., § 17C–1–1 et seq. and § 17D–1–1 et seq.] of this code.

**2.** *See* House Bill 2100, the budget bill, introduced in the House of Delegates on February 10, 1993. The same budget bill was introduced in the Senate as Senate Bill 50. *See also,* Department of Public Safety Account No. 5700, line item for salaries, $34,974,582, and Division of Motor Vehicles Account No. 6710, unclassified item, $4,313,697. (The Public Safety pay raise for 1993 was paid from the Department of Motor Vehicles' account and the unclassified item was listed at $10,913.69.)

posed $.05 a gallon increase in the gasoline tax.

But now comes the reason for the exasperation expressed in the first paragraph of this dissent. The majority opinion, which was filed March 25, 1993, declared constitutional the 1990 legislative action which provided that money could be diverted from the constitutionally protected gasoline tax. As a result, a $6.4 million windfall fell into the arms of a legislature and executive desperate for money to balance the fiscal year 1994 budget without raising more taxes.

The fiscal year budget finally passed during the first extraordinary session of the Legislature in May, 1993, reflected the results of the majority opinion. The salary increases would not come from the general revenue budget as originally proposed in February, but instead were to be paid out of the DMV's gasoline tax revenues. The "unclassified" line item in the DMV budget was increased, while the line item in the Department of Public Safety budget to pay the salary increases was reduced.[3] Voila!! Their cup runneth over.[4]

But enough about the rapture that the Executive and Legislative branches are enjoying, and more about the serious fissures the majority opinion creates.

Article VI, § 52 of the West Virginia Constitution, adopted by a vote of the citizens of this State in November, 1942, states that:

Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels shall, after deduction of statutory refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued or which may be hereafter issued for the construction, reconstruction or improvement of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways. (Emphasis added.)

The underlined language of this amendment is the subject of a lengthy and tortured interpretation in the majority opinion. I do not see why. In syllabus point 1 of this Court's unanimous opinion in *Jarrett Printing Company v. Ronald Riley, et al.*, 188 W.Va. 393, 424 S.E.2d 738 (1992), filed only four months before the majority opinion, this Court once again reiterated the long accepted principle of constitutional interpretation:

"Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed." Syl. pt. 3, *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791 (1965).

There are few constitutional provisions plainer than Article VI, § 52. It is not written in Chaucerian English or the English used in 1863, or any version of the English language that might possibly be subject to interpretation. It is written in the English of 1942, the year the amendment was adopted, which happens to be the very same English that we still speak, read, and write today. A high school stu-

3. Enrolled Committee Substitute for H.B. 105, the 1994 budget bill, was passed by the Legislature on May 27, 1993, effective from passing, during the First Extraordinary Session of the 71st Legislature; Enrolled Committee Substitute for H.B. 105 appropriated to the Division of Public Safety Account No. 5700, for fiscal year 1994, $25,896,586 (some $9,000,000 less than was requested in the budget bill submitted in February, 1993), which had been money for the pay increase; and Enrolled Committee Substitute for H.B. 105 appropriated to the Division of Motor Vehicles Account No. 6710, for fiscal year 1994, unclassified item $10,435,396. The differ-

ence of $6,121,699 from the original budget bill introduced on February 10, 1993, and the final budget bill enacted was to pay the Department of Public Safety salary increase out of the gasoline tax revenues.

4. The majority, on page 9 of their opinion, stated that for the purposes of the opinion the funds expended from the DMV pursuant to W.Va.Code § 15–2–12(i) (1990) involve funds described in the constitutional amendment (gasoline revenues).

dent would have no trouble reading the amendment and explaining the meaning of the words "construction, reconstruction, repair and maintenance." Still, the majority was not deterred, and after fifty-one years it changed the definition of "maintenance" to justify the actions of a legislative body which was desperate to "find" money to avoid raising taxes.

The majority cites as authority for their decision syllabus point 4 of *State ex rel. Smith v. Kelly*, 149 W.Va. 381, 141 S.E.2d 142 (1965):

> "Though it is a cardinal rule of constitutional construction to give effect to the intent of the framers of the Constitution and the people who adopted it, *new and changing conditions* not existing at the time the Constitution was adopted should be looked to and applied in the interpretation of a *procedural* provision of the Constitution." Point 4 Syllabus, *State ex rel. Morgan et al. v. O'Brien*, 134 W.Va. 1, 60 S.E.2d 722. (Emphasis added.)

To support its option, the majority finds "new and changing conditions" in the building of interstate highways, creating a greater need for highway safety. West Virginia had a vast network of highways in 1942, and the constitutional amendment adopted by the people in 1942 was to construct a new "primary" road system that would meet the needs of an increasingly mobile population, all to be constructed and financed from "road user" taxes.

The majority's use of syllabus point 4 of *State ex rel. Smith v. Kelly*, 149 W.Va. 381, 141 S.E.2d 142 (1965), as authority for interpreting the plain language of Article VI, § 52 creates a result quite different from what was originally intended, which was for gasoline tax revenues to be used solely for the construction, reconstruction, repair and maintenance of public highways. The majority's result permits funds to be diverted from gasoline tax revenues in order to pay for the costs of highway safety provided by the West Virginia Department of Public Safety on state highways, which includes road patrol, traffic, including acci-

dent investigation, preparing accident reports, serving traffic warrants, time spent at traffic court involving highway violations, operators examinations, and assisting the Division of Motor Vehicles.[5]

Is the majority telling us that these things, which are essential to providing highway safety, are "new and changing conditions" which were not a part of providing highway safety way back in 1942? Surely, these same highway safety costs were incurred in 1942, when Article VI, § 52 was adopted. Regardless, fifty-one years later, four Justices of this Court redefine "maintenance" to include "highway safety," which encompasses all activities performed by the Department of Public Safety or associated with activities performed by the Department of Public Safety on State highways. Does it also include the proportionate cost of the patrol car that is used in road patrol and the proportionate cost of a helicopter or airplane that is sometimes used in traffic surveillance?

The judicial cornucopia that is the majority opinion also includes other gifts. The majority opinion declared constitutional the DMV's use of money for implementation of W.Va.Code § 17A–4–10(c), W.Va.Code § 17A–6B–3 (1990), and duties of the Department of Public Safety set out under W.Va.Code § 17C–1–1 et seq., W.Va.Code § 17A–3–3(a)(7) (1984), W.Va.Code § 17B–1D–7 (1990); W.Va.Code § 17A–4–10(c) (1990), and W.Va.Code § 17A–6B–3(b) (1990). The majority opinion states that the DMV's expenditure of monies in reimbursing the Department of Public Safety for their proven costs in implementing these Code sections is constitutional under Article VI, Section 52 of the West Virginia Constitution.

The majority finds some of these expenditures to be "administrative costs" authorized by Article VI, Section 52 of the West Virginia Constitution. Again, it is difficult to understand this rationale. The constitutional amendment clearly states:

> All ... revenue derived from motor vehicles ... shall, after deduction of statuto-

---

**5.** These costs are not recoverable from the Federal Highway Trust Fund as part of the federal government's share of matching money for construction of highways.

ry refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued....

"Cost of administration," as set out in Article VI, § 52, refers to "deduction of statutory refunds and cost of administration and collection of the tax", for the payment of the bonds issued to provide the revenue for the construction, reconstruction, repair and maintenance of public highways. Some of these costs may be legitimate under the amendment, but to lump those expenditures under the umbrella of maintenance and administrative costs as part of highway safety evidences the majority's intent to change the meaning of the constitutional amendment to meet expenditures which were not contemplated by the voters in 1942 when the constitutional amendment was adopted.[6]

The haunting question created by the majority opinion is whether the municipal police and deputy sheriffs can now ask the Legislature for equal treatment in view of the fact that they perform the same so-called "maintenance = highway safety duties," as the Department of Public Safety, and on the very same highways. The municipal police and deputy sheriffs perform patrol and traffic court activities on State highways passing through the various municipalities and counties. Their jurisdiction over these activities is concurrent in most cases, with the Department of Safety. I am sure that the answer to this question would be that the Legislature would never do such a thing. However, be they public or private, special interest groups are the gasoline that fuels the legislative machine. Now that one group, like the camel, has gotten its nose under the tent, how long will it be before other camels start nosing around? It is amazing

what can happen after a Pandora's "tent" is opened.

Roads and education—education and roads—are two budgetary mainstays essential to providing a productive future for our present and future citizens. To dilute the taxes already dedicated to the construction, reconstruction, repair and maintenance of that road system is tragic. And to change the plain meaning of a well-defined word in order to satisfy a legislative act jeopardizes the future of the highway system of this State and creates a doubt in the mind of the voter when he or she votes for a constitutional amendment. Our citizens do not need further cause for any deeper cynicism about their government and the future of this State.

Why have a constitution if the plain meaning of its language can be so easily subverted and redefined to conform to legislative needs? Does the end justify the means? I don't think so.

For these reasons, I dissent.

---

**6.** The majority opinion held that the expenditures of highway users funds for the construction of Department of Public Safety police barracks was not an activity that was connected to highway safety and was, therefore, unconstitutional under Article VI, Section 52 of the West Virginia Constitution.